ISOM BRADLEY V. THE STATE.

No. 9341.　Delivered November 4, 1925.

**1.—Murder—Charge of Court—Somnambulist—Failure to Charge On—
　　Error.**

　　Where, on a trial for murder, two defensive theories are presented by the evidence, one, that the shooting was inspired by the mistaken

belief that the deceased was another person, in the act of assaulting appellant, and the other, that the shooting occurred while appellant was in a state of somnambulism, and therefore not mentally and morally responsible, it was error for the trial court to fail to submit the somnambulistic defense.

### 2.—Same—Somnambulist—Recognized in Law—As a Defense.

A somnambulist is generally recognized in law and in medical science, as one who is not in sufficient control of his mental perception and power of volition to be morally responsible for his acts, and in its complete analysis and classification it is recognized as a disease, and is designated as insanity, according to the modern scientist and alienist. See opinion for discussion and citation of authorities on this very interesting subject.

### 3.—Same—Evidence—Of Surroundings—Properly Admitted.

It is a well settled rule of evidence that the condition of the body of a deceased person and the things in the vicinity in which it was found is admissible in a prosecution for the killing. See Wharton on Homicide, 3rd Ed., Sec. 606. Following Mendez v. State, 29 Tex. Crim. App. 613 and other cases collated in Branch's Ann. Tex. P. C. p. 83, Sec. 147, subdivision 6.

### 4.—Same—Evidence—Acts of Deceased—Held, Not Admissible.

Acts and relations of the deceased with a third party, which were unknown to appellant were erroneously admitted. This testimony tended to impinge upon the appellant's testimony negativing any motive for shooting the woman, and if he was ignorant of the alleged facts which witness related, his defensive theory could not be impaired by the testimony in question.

Appeal from the District Court of Burleson County. Tried below before the Hon. R. J. Alexander, Judge.

Appeal from a conviction of murder, penalty five years in the penitentiary.

The opinion states the case.

*Bowers & Bowers,* for appellant.

*Sam D. Stinson,* State's Attorney, and *Nat Gentry, Jr.,* Assistant State's Attorney, for the State.

MORROW, Presiding Judge.—The offense is murder; punishment fixed at confinement in the penitentiary for a period of five years.

Appellant, a negro, twenty-seven years of age, was living in adultery with the deceased, Ada Jenkins. According to his testimony, there existed between him and the deceased the most cordial and affectionate relations. One Lawrence Williams was an enemy and had made some threats against the appellant. After retiring on the night of the homicide, the deceased and

the appellant discussed Williams. Deceased gave the appellant information which tended to alarm him, and put him in fear of a secret attack by Williams. During the conversation and thereafter, while reflecting upon it, appellant became more and more alarmed, and as he expressed it, he felt "jubious and jubiouser", and took from a table which was near his bed a pistol, which he put under the pillow upon which his head was lying.

His further statements descriptive of the tragedy, we quote from his testimony:

"I goes off to sleep. I never waked up any more till I was disturbed by a noise in the house. I went to sleep with that on my mind. The last I remembered was that the door was not fastened. After the noise in the house disturbed me, I was nervous, and I was not reconciled to the noise in the house. I was scared. I just jumped up with my gun and commenced shooting. I made a couple of shots, about two shots or three. And so then when I found myself and got reconciled I was standing up in the floor. Then I turned to the library table at the head of the bed where I slept and lit the lamp. When I lit the lamp I found her laying there dead. She was laying at the foot of the bed next to the partition wall when I lit the lamp; she was laying there. As to knowing whether I killed her or not, well, I was shooting; I couldn't say I killed her because I didn't know what I was doing. When I lit the lamp she was there dead. As to my intentionally killing Ada Jenkins, or knowing I did so, I was shooting is all I can say. I was not trying to kill her; no, sir. I would not have killed her if I had known it was her for nothing in the world."

Upon the testimony quoted, it is believed that the court committed error in declining to instruct the jury upon the law of manslaughter. Manslaughter is a *voluntary homicide* committed by one whose mind is rendered incapable of cool reflection by sudden passion aroused by adequate cause. It is conceived that an involuntary homicide such as the appellant's testimony tends to show, does not come within the purview of the Statute defining manslaughter. The testimony quoted does not convey a clear conception of the exact state of the appellant's mind; that is to say, whether it was his idea that he was about to be attacked by an enemy and fired under this mistaken belief, or whether his testimony brings him within the category of a somnambulist, of which it has been said:

"As the somnambulist does not enjoy the free and rational exercise of his understandings, and is more or less unconscious

of his outward relations, none of his ·acts during the paroxism can rightfully be imputed to him as crimes." (Ray's Medical Jurisprudence, Sec. 508.)

These ideas differ in that one presents the theory of a voluntary shooting of the deceased upon the mistaken belief that she was another person, while the other presents the theory that the shooting took place when the appellant was ·apparently awake, though in fact, asleep, and that there was no conscious volition to kill the woman or any other person. The theory first mentioned above was embraced in the main charge in the following language:

" * * * and you should further believe that said defendant so shot and killed the said Ada Jenkins under the mistaken belief that she, the. said Ada Jenkins, was some other person, or persons, who had entered upon the premises occupied by the defendant, for the purpose of unlawfully assaulting the defendant, or if the evidence raises in your minds a reasonable doubt thereof, then you should find the defendant not guilty."

It is clear that in this charge no note is taken of the state of mind of the appellant other than that which relates to the subject of the mistaken identity of the person killed. As presenting the other theory arising from the. appellant's testimony, he presented and the court refused a special charge in the following language:

"I instruct you that if you believe from the evidence that the defendant shot the deceased while asleep, and not knowing what he was doing, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict, not guilty."

The idea embraced in the special charge was not included in the main charge. In this state, the same question has not, so far as we are aware, heretofore arisen. It is not altogether novel, however, but has been dealt with in some other jurisdictions.

Touching the subject of somnambulism, it is said:

" 'Not only is the power of locomotion enjoyed, as the terminology of the term signifies, but the voluntary muscles are capable of executing motions of the most delicate kind. Thus, the somnambulist will walk securely on the edge of a precipice, saddle his horse, and ride off at a gallop; walk on stilts over a swollen torrent; practice airs on a musical instrument; in short, he may read, write, run, leap, climb, and swim, as well as, and sometimes even better than, when fully awake.' (Ray's Med. Jur., Sec. 495; Wharton & Stille, Taylor, and

Brown announce similar views; Wharton & Stille on Med. Jur., Sec. 149 et seq.; Taylor's Med. Jur., page 176; Med. Jur. of Insanity, Sec. 328 et seq.)

Under the general head of mental unsoundness connected with sleep, Wharton & Stille group somnolentia, somnambulism, and nightmare.

They define somnolentia 'to be the lapping over of a profound sleep into the domain of apparent wakefulness,' and say that it produces a state of involuntary intoxication, which for the time destroys moral agency. (Med. Jur., Section 151.)

The writings of medical and medico-legal authors contain accounts of many well-authenticated cases in which homicides have been committed while the perpetrator was either asleep or just being aroused from sleep, and in commenting on these cases, Brown, in his Medical Jurisprudence of Insanity, uses this language:

Sec. 338. 'Indeed, there are very many cases in which the confused thoughts of awakening consciousness have led to disastrous consequences. And this is to be accounted for by the fact that there is a state between sleeping and waking when the thoughts of the dreamer have as much reality as the facts he is assured of by his senses.' " (Fain v. The Commonwealth, 78 Ky. Rep. pp. 186-187).

Somnambulism is recognized as a species of insanity. From Bouvier's Law Dict., Rawle's 3rd Edition, Vol. 3, p. 3091, we take the following quotation:

"The legal consequences of somnambulism should be precisely those of insanity, which it so nearly resembles. The party should be exempt from punishment for his criminal acts."

In effect, the same announcement is made in Bishop's New Crim. Law, Vol. 1, Sec. 395.

In classifying the forms of insanity, it is said:

"If to his we add somnambulism, which is unconscious cerebration during sleep, we will have a full and complete analysis and classification of this disease called insanity according to the modern scientists and alienists." (Stewart's Legal Medicine, Sec. 146, p. 373).

In the case of Fain v. The Commonwealth, 78 Ky. Rep. 183, the accused was convicted of murder and upon his trial he sought to offer evidence to the effect that when suddenly awakened from his sleep, he fired with no conscious motive or intent to kill the deceased. The case was reversed for the refusal to receive this testimony. In the opinion, we find this language:

"If the prisoner, when he shot the deceased, was unconscious, or so nearly so that he did not comprehend his own situation and the circumstances surrounding him, or that he supposed he was being assailed, and that he was merely resisting an attempt to take his life or do him great bodily injury, he should be acquitted—in one case, because he was not legally responsible for any act done while in that condition, and in the other, because he is excusable on the ground of self-defense; for although it is clear that he was not in danger, and had no reasonable grounds to believe he was, yet if, through derangement of his perceptive faculties, it appeared to him that he was in danger, he is as free from punishable guilt as if the facts had been as he supposed them to be."

In the present case, the opinion is entertained that in refusing the special charge to which reference has been made, an important defensive issue raised by the evidence was withheld from the consideration of the jury.

We find in the record some twenty-five bills of exception. Many of them are imperfect in so meagrely stating the surrounding facts as to render us unable to appraise their merits. Some of them are wholly in question and answer form or the transcribed notes of the stenographer, and for that reason cannot be considered. Several of them relate to the refusal of special charges. In view of the disposition we are making of the case, we have examined all of the bills. Most of them, relating to the receipt of testimony showing conditions surrounding the homicide, were properly received under the rule stated in general terms in Wharton's work on Homicide, 3rd Ed., Sec. 606, in these words:

"The condition of the body of a deceased person and of things in the vicinity in which it was found is admissible in evidence in a prosecution for the killing. This is a general statement of a rule universally recognized, which is fortified and particularized in the following sections."

The appellant having testified as a witness in his own behalf, the court committed no error in permitting State's counsel to recall him for further cross-examination. See Mendez v. State, 29 Tex. Crim. App. 613; and other cases collated in Branch's Ann. Tex. P. C., p. 83, Sec. 147, subdivision 6.

The witness, Sambo Evans, testified that on the day on which the deceased was killed, he gave her two squirrels, and that he saw her in the woods about a mile or more from her residence in the absence of the appellant. In his testimony, he used language which we understand to mean that his relations

with her were improper and had been for some time. He said that while he and deceased were in the woods, she remarked that there was someone coming; that he saw the legs of someone but could not identify him. It was shown by other testimony that the appellant was aware of the fact that the deceased received the squirrels from Evans. He claimed that he took no offense; that his relations with the deceased were the most friendly and affectionate. The bill is imperfect. However, in view of another trial, we have to suggest that unless there be some testimony warranting the inference by the jury of knowledge on the part of the appellant of the improper relations between the deceased or with the particular transaction in question, that the testimony to the effect that Evans and the deceased were intimate and that they were in the woods together and that some person was seen by them, should be rejected. This testimony of Evans tended to impinge upon the appellant's testimony negativing any motive for shooting the woman, and if he was ignorant of the alleged facts which Evans related, his defensive theory could not properly be impaired by the testimony in question.

Whether the fatal shot was unconsciously fired by the appellant or was the result of a mistake of the identity of the deceased were questions of fact for the jury, and it was his right to have the court give adequate instruction thereon. If the jury rejected these theories, the evidence is not wanting upon which to predicate a verdict of murder. It was proper for the court to submit that issue. Because of his failure, however, to give the special charge requested, to which we have adverted, or to embrace its substance in the general charge, the learned trial judge fell into error which was, under the facts of the case, prejudicial to the appellant and which warrants this court in ordering a reversal of the judgment, which is accordingly done.

*Reversed.*