David LUGO–LUGO, Appellant,

v.

The STATE of Texas, Appellee.

No. 60018.

Court of Criminal Appeals of Texas, En Banc.

April 27, 1983.

James R. Thompson, Copperas Cove, for appellant.

Arthur C. Eads, Dist. Atty., Ralph Petty and James T. Russell, Asst. Dist. Attys., Belton, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION ON STATE'S MOTION FOR REHEARING

CAMPBELL, Judge.

Appellant was indicted for murder under V.T.C.A. Penal Code, Sec. 19.02(a)(2). Appellant waived his right to a jury trial,

and was found guilty by the trial court. The trial court assessed punishment at life imprisonment.

On original submission, a panel of this Court reversed appellant's conviction, vacated the judgment of the trial court, and ordered the prosecution dismissed. The Court now considers this cause, sitting en banc, and the panel opinion is withdrawn.

We note at the outset that the panel on original submission found that fundamental error existed in the indictment and therefore did not consider the two grounds of error raised by the appellant in his brief on appeal. The panel found that the indictment was wanting in that there was an absence of a culpable mental state under V.T.C.A. Penal Code, Sec. 6.02, preceding the phrase "commit an act clearly dangerous to human life, to-wit: did then and there kick the said Taelia Dana Ris Pinero in her abdomen thereby causing the death of the said individual." The indictment in this cause, omitting the formal parts, is set out as follows:

"... did then and there intending to cause serious bodily injury to an individual, Taelia Dana Ris Pinero, commit an act clearly dangerous to human life, to-wit: did then and there kick the said Taelia Dana Ris Pinero in her abdomen thereby causing the death of the said individual ..."

See V.T.C.A. Penal Code, Sec. 19.02(a)(2), supra.

The problem before us was succinctly and properly identified in the Practice Commentary to V.T.C.A. Penal Code, Sec. 6.02, supra:

"The 1970 proposed code contained a section 6.06 providing that 'if the definition of an offense prescribes a culpable mental state but does not specify the conduct, circumstances surrounding the conduct, or result of the conduct to which it applies, the culpable mental state applies to each element of the offense.' The section would have resolved the ambiguity, frequently encountered in criminal statutes, as to which elements of an offense the culpable mental state applies.

For example, Penal Code Art. 1350, which proscribed malicious mischief, provided that 'it shall be unlawful for any person to willfully injure or destroy, or attempt to injure or destroy, any property ... without the consent of the owner ....' Did the culpable mental state 'willfully' modify only 'injury or destroy' or did it modify 'without the consent of the owner' as well, so that the State to convict had to prove the actor knew he didn't have the owner's consent? Sec. 6.06 answered this question, when the term describing the culpable mental state did not syntactically modify the conduct, circumstances surrounding the conduct, or result of the conduct in the definition of the offense, by providing that the culpable mental state applied to each of these types of elements of the offense definition. Its deletion will be missed because the syntax of several sections in this code leaves ambiguous the relationship between the required culpable mental state and various offense definition elements, e.g., Sections 30.05, 42.02, 43.23, 47.05."

The statutory provisions relevant to our examination are as follows:

V.T.C.A. Penal Code, Section 6.02(a):
"Except as provided in Subsection (b) of this section a person does not commit an offense unless he intentionally, knowingly, recklessly, or with criminal negligence engages in conduct as the definition of the offense requires."

V.T.C.A. Penal Code, Section 6.02(b):
"If the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element."

V.T.C.A. Penal Code, Section 6.02(c):
"If the definition of an offense does not prescribe a culpable mental state, but one is nevertheless required under Subsection (b) of this section, intent, knowledge, or recklessness suffices to establish criminal responsibility."

V.T.C.A. Penal Code, Section 19.01(a):
"A person commits criminal homicide if he intentionally, knowingly, recklessly, or

with criminal negligence causes the death of an individual."

V.T.C.A. Penal Code, Section 19.01(b): "Criminal homicide is murder, capital murder, voluntary manslaughter, involuntary manslaughter, or criminally negligent homicide."

V.T.C.A. Penal Code, Section 19.02(a): "A person commits an offense if he:

"(1) intentionally or knowingly causes the death of an individual;

"(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

"(3) commits or attempts to commit a felony, other than voluntary or involuntary manslaughter, and in the course of and in furtherance of the commission or attempt, or an immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual."

In answering the question posed in the Practice Commentary to V.T.C.A. Penal Code, Section 6.02, supra, as it pertains to the required culpable mental state in Section 19.02(a)(2), a panel of this Court held:

"Similarly here in V.T.C.A. Penal Code, Section 19.02(a)(2) the Legislature has required two mental states. One is the specific intent to cause serious bodily injury; it must be coupled with a voluntary act that the defendant either intended or knew was clearly dangerous to human life because of the definition of criminal homicide itself contained in Section 19.01(a), supra."

The panel opinion further concludes:

"After reviewing the definitions of these mental states, we further conclude that V.T.C.A. Penal Code, Section 19.02(a)(2) requires that the specific intent to cause serious bodily injury be coupled with one of the culpable mental states of intentionally or knowingly. Because this indictment *fails to allege a culpable mental*

state[1] it fails to allege a necessary element of the offense."

In resolving this issue, this Court is not without *stare decisis* in analogous situations. In *Teniente v. State,* 533 S.W.2d 805 (Tex.Cr.App.1976), then Commissioner Dally, in an opinion approved by this Court, held:

"The conduct that is the gist of the offense of burglary in this case is the entry into the habitation with the requisite intent. The indictment alleges the culpable mental state with which the appellant entered the habitation; it alleges he entered the habitation 'with the intent to commit theft.' "

The indictment in *Teniente,* supra, omitting the formal parts, alleged the following:

"... did then and there with intent to commit theft, enter a habitation without the effective consent of Carlos Reyna, the owner."

See V.T.C.A. Penal Code, Section 30.02(a)(1).

In *Bermudez v. State,* 533 S.W.2d 806 (Tex.Cr.App.1976), this Court, in an en banc opinion by Judge Morrison, citing *Teniente v. State,* supra, and other cases, expounded at great length upon the allegation of culpable mental states and the proof required thereof:

"Appellant's position is that an act otherwise sufficient to constitute a crime will not be a crime unless the act is voluntarily engaged in and the element of voluntariness must always be pled. Appellant contends the new penal code specifically requires both 'a voluntary act' and 'culpability' be alleged in the indictment."

"This Court has held that the requirement of a culpable mental state is mandatory in the absence of clear language to the contrary. See *Braxton v. State,* 528 S.W.2d 844 [ (Tex.Cr.App.1975) ]; *Ex parte Ross,* 522 S.W.2d 214 [ (Tex.Cr.App. 1975) ]; *Teniente v. State,* 533 S.W.2d 805 [ (Tex.Cr.App.1976) ]. However, this re-

---

1. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

sult is mandated by the provisions of V.T.C.A. Penal Code, Section 6.02(b) as follows:

"'(b) If the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless a definition plainly dispenses with any mental element.'

"Since Section 6.01 does not contain a similar provision, voluntariness need not be pled unless it is an essential element of an offense [citations omitted.] 'Elements of offense' is defined in V.T.C.A. Penal Code, Section 1.07(a)(13) as the forbidden conduct, the required culpability, any required result, and the negation of any exception to the offense. The forbidden conduct in the case at bar as prescribed by V.T.C.A. Penal Code, Sections 29.-02(a)(2) and 29.03(a)(2)[2] does not contain a requirement of voluntariness. Voluntariness is separate and apart from the required culpability and from the required result. Absence of voluntariness cannot be construed as an exception to the offense since V.T.C.A. Penal Code, Section 2.02(a) provides that exceptions are so labeled."

"We hold that the issue of 'voluntariness' of the conduct is in the nature of a defense and need not be pled in the indictment. See V.T.C.A. Penal Code, Section 2.03(b). See also *Harris v. State,* 91 Tex.Cr.R. 446, 241 S.W. 175; *Bradley v. State,* 102 Tex.Cr.R. 41, 277 S.W. 147."

The pertinent part of the indictment in *Jones v. State,* 545 S.W.2d 771 (Tex.Cr.App. 1977) provided as follows:

"... did then and there with the intent to defraud and harm, forge, by passing to Jerry Haile, a writing, as follows: ...."

In *Jones · v. State,* supra, Judge Roberts, on State's Motion for Rehearing, opined:

"The question is, then does an indictment drafted under the strict language of this statute sufficiently charge an offense? Only if it does not is the indictment fundamentally defective. *Standley v. State,* 517 S.W.2d 538 (Tex.Cr.App. 1975); *American Plant Food Corp. v. State,* 508 S.W.2d 598 (Tex.Cr.App.1974).

"A reading of the statute reveals that it unequivocally prescribes a single culpable mental state for forgery: this is the intent to defraud or harm, which is required by subsection (b) of Section 32.21. See *Teniente v. State,* 533 S.W.2d 805 (Tex.Cr.App.1976). Thus the requirement of V.T.C.A. Penal Code, Section 6.02(a) is satisfied on the face of the statute; subsections (b) and (c) of Section 6.02 simply do not apply."

As to the indictment in *Jones v. State,* supra, Judge Roberts concluded:

"Thus, we can conclude first, that the Legislature did not intend to include knowledge that the instrument was forged an essential element of the offense of forgery, and, second, the legislative intent does not provide a requirement that the State allege such a knowledge in an indictment."

The indictment in *Clark v. State,* 558 S.W.2d 887 (Tex.Cr.App.1977), in pertinent part, read as follows:

"... did then and there unlawfully with intent to arouse the sexual desire of the defendant have sexual contact by touching the genitals of L— M— M—, a child under the age of seventeen years and not his spouse."

In *Clark v. State,* supra, then Commissioner Brown, in an opinion approved by this Court, held:

"In the instant case, the gist of the offense is appellant's having sexual contact with the prosecutrix, with the requisite intent. The indictment does allege the culpable mental state with which he had sexual contact. Therefore, under the authority of *Teniente v. State,* supra, ap-

**2.** Omitting the formal parts, the indictment in the *Bermudez* case alleged that appellant: 'did then and there unlawfully while in the course of committing theft and with intent to maintain control over a shotgun and a television set, personal property owned by Frank Hufsmith, intentionally and knowingly placed Genevie Velasquez in fear of imminent bodily injury and death by using and exhibiting a deadly weapon, namely a firearm.'

pellant's third ground of error is overruled. See also *Johnson v. State,* 537 S.W.2d 16 (Tex.Cr.App.1976)."

In *Martinez v. State,* 565 S.W.2d 70 (Tex. Cr.App.1978), omitting its formal parts, stated:

"... did then and there unlawfully with intent to commit theft enter a building not then open to the public, owned by Jim Patrick, hereafter styled the complainant, without the effective consent of the complainant."

In *Martinez v. State,* supra, Presiding Judge Onion, in a panel opinion, opined:

"The indictment in the present case alleged that the entry was made with the intent to commit theft. As we stated in *Victory v. State,* 547 S.W.2d 1 (Tex.Cr. App.1976): 'Teniente stands for the proposition that the allegation of the required particular intent sufficed for the more general culpable mental state as well."

In *Jones v. State,* 571 S.W.2d 191 (Tex.Cr. App.1978), the indictment, omitting the formal parts, alleged:

"... did then and there with intent to defraud and harm another, pass to William Wong, a writing that has been made, altered, and completed so that it purported to be the act of another who did not authorize the act, and which said writing is to the tenor following: ...."

In *Jones v. State,* supra, in a panel decision by Judge W.C. Davis, it was held:

"The indictment in the instant case does allege that the act was committed 'with intent to defraud or harm another,' which is the essential mental element. Therefore, the indictment is not fundamentally defective for failing to allege a culpable mental state. *Jiminez v. State,* supra [552 S.W.2d 469 (Tex.Cr.App. 1977)]; *Jones v. State,* supra; see also *Teniente v. State,* 533 S.W.2d 805 (Tex. Cr.App.1976). Appellant recognizes our prior ruling on this matter, but urges that we overrule our prior holdings. This we decline to do, for the reasons stated in *Jones v. State,* supra. Appellant's first contention is overruled."

In *Jason v. State,* 589 S.W.2d 447 (Tex.Cr. App.1979), this Court was confronted with an indictment that alleged in pertinent part that appellant did:

"unlawfully, intentionally, and knowingly have sexual intercourse with a female under the age of seventeen years and not his wife, D— R— M—, hereafter styled the complainant, and the defendant did compel complainant to submit to the act of sexual intercourse by threatening the imminent infliction of serious bodily injury and death to the complainant ...."

Judge W.C. Davis, joined in the panel decision by Presiding Judge Onion and Judge Roberts, concluded:

"In the instant case, the indictment clearly alleges that appellant 'knowingly and intentionally had sexual intercourse' with the complainant. It further alleges that he compelled her submission to the intercourse. The allegations are such that before appellant could have had sexual intercourse with the complainant, he had to have compelled her submission into the act first. Thus, the reference to appellant's compelling the submission of the complainant refers to the knowing and intentional act of sexual intercourse. The allegation that appellant 'knowingly and intentionally' had sexual intercourse with complainant *includes* the allegation that he also knowingly and intentionally committed the acts by which means he accomplished the rape, i.e., compelling submission by threats. We hold that for the above reasons, this indictment sufficiently alleges a culpable mental state in the aggravation portion of this indictment. See and compare *Ex parte Smith,* supra [571 S.W.2d 22 (Tex.Cr.App.1978)]; *Dovalina v. State,* 564 S.W.2d 378 (Tex. Cr.App.1978); *Clark v. State,* 558 S.W.2d 887 (Tex.Cr.App.1977); *Johnson v. State,* 537 S.W.2d 16 (Tex.Cr.App.1976); *Teniente v. State,* 533 S.W.2d 805 (Tex.Cr. App.1976)."

In *Ex parte Prophet,* 601 S.W.2d 372 (Tex.Cr.App.1980), this Court was confronted with an indictment, omitting the formal parts, which alleged that appellant:

"did then and there unlawfully with intent to commit rape, attempt, by force and by threatening the imminent infliction of bodily injury and death, to have sexual intercourse with N— S— M—, a female not his wife and without her consent."

Petitioner contended in *Prophet,* supra, that the "intent to commit rape" alleged in the indictment did not suffice to allege a culpable mental state. In an en banc opinion by Presiding Judge Onion, this Court opined:

"We have repeatedly held that where the gravamen of an offense is an act coupled with a specific intent, pleading the requisite specific intent is sufficient to allege a culpable mental state. See e.g., *Teniente v. State,* 533 S.W.2d 805 (Tex.Cr.App. 1976), *where the gist of burglary was held to be entry into the habitation with the intent to commit theft; Clark v. State, 558 S.W.2d 887 (Tex.Cr.App.1977), where the gist of indecency with a child by sexual contact was held to be the act of touching the child's penis or genitals with the intent to arouse or gratify sexual desire; Jones v. State, 571 S.W.2d 191 (Tex.Cr.App.1978), where the gist of forgery by passing was held to be the act of passing the instrument with the intent to defraud or harm another; Jones v. State, 579 S.W.2d 240 (Tex.Cr.App.1979), where the gist of possessing beer for sale in a dry area was held to be the act of possession with the intent to offer it for sale.*

. . . . .

"Although it would be better practice to allege the culpable mental state of the attempted offense, failure to allege the constitute elements of the offense attempted is not a fundamental defect. *Williams v. State,* 544 S.W.2d 428, 430 (Tex.Cr.App.1976)."

The authorities cited up to this point in our examination have dealt with penal statutes that required *a single* culpable mental state under V.T.C.A. Penal Code, Section 6.02, supra. In *Ex parte Santellana,* 606 S.W.2d 331 (Tex.Cr.App.1980), Presiding Judge Onion, writing for this Court en banc, addressed the mens rea requirement of the aggravated robbery statute in V.T. C.A. Penal Code, Section 29.03. In *Santellana,* supra, the indictment, omitting the formal parts, alleged that petitioner:

"did then and there while in the course of committing theft of money owned by Susie Oyervides, hereafter styled the complainant, and with intent to obtain and control the property threatened and placed the complainant in fear of imminent bodily injury and death by using and exhibiting a deadly weapon, namely, a pistol . . . ."

Petitioner alleged that this indictment was fundamentally defective for failure to allege the necessary element of a culpable mental state. Presiding Judge Onion, opined:

"A different situation exists, however, in the instant case. While it might be readily apparent what single act constitutes the 'gist' of burglary or indecency with a child, the 'gist' of aggravated robbery is considerably less simple to determine. *Two criminal acts* are implicit in the offense of aggravated robbery: a theft, whether attempted, in progress, or completed, and an assault, which in the instant case was allegedly done by threat with a deadly weapon, V.T.C.A. Penal Code, Section 29.02(a)(2), 29.03(a)(2); cf. V.T.C.A. Penal Code, Section 31.03, 22.01. The Legislature in defining the offense expressly placed two requisite mental states into the language of the statutes: the offender must act with intent to obtain and maintain control over property, and his threatening or placing the victim in fear must be intentional or knowing.

"Viewed in this light, it appears that the phrase 'intent to obtain or maintain control over the property' deals with the robber's state of mind regarding the property in question. The 'intentionally or knowingly' element is directed to his state of mind in threatening or placing the victim in fear, the assaultive component of the offense of aggravated robbery. The State contends in essence that the language 'intentionally of knowingly' in the statute is superfluous, and that the

offense can be adequately alleged without it. However, we find that the construction of the statute as explained above is more consistent with sound principles of statutory interpretation. The guiding standard is that every word of a statute must be presumed to have been used for a purpose, and that the Legislature must be presumed to have intended the entire statute in question to be effective. *Morter v. State,* 551 S.W.2d 715, 718 (Tex.Cr.App.1977); Article 5429b–2, Sec. 3.01(2), V.A.C.S. To accept the State's argument would be to reject this sound and long-standing body of law. We decline to do so.

"The results of *Teniente,* supra, and *Clark,* supra, are consistent with this view. The statute in question in *Teniente,* V.T.C.A. Penal Code, Section 30.-02(a)(1), contains a specific intent element, that the entry be made 'with intent to commit a felony or theft.' However, unlike V.T.C.A. Penal Code, Section 29.-02(a)(2), there is no additional general intent element stated in the statute. The indictment in Teniente, which tracked the statute verbatim, thus alleged all of the express elements of burglary. The attack on the indictment was that V.T.C.A. Penal Code, Section 6.02, required allegation and proof of an intentional, knowing or reckless entry, in addition to the elements to the burglary statute. The contention was properly rejected for the reasons already stated."

Presiding Judge Onion concluded in *Santellana,* supra:

"The defect in the indictment in the instant case is that, unlike the indictments in *Teniente* and *Clark,* it omits an element clearly required by the applicable statute to be pled and proven."

In addition to the case authority developed to this point, it is instructive to compare these authorities with this Court's holding in *Ex parte Easter,* 615 S.W.2d 719 (Tex.Cr.App.1981). Although *Easter,* supra, dealt with an indictment under V.T.C.A. Penal Code, Section 19.02(a)(3), the so-called felony murder rule, an analogous interpre-

tation may be drawn from its teachings. In *Easter,* supra, the indictment alleged that petitioner:

"did then and there unlawfully commit and attempt to commit a felony, namely, injury to a child, and in the course of and in the furtherance of the commission and attempt, the defendant did commit and attempt to commit acts *clearly dangerous to human life* which did cause the death of Kimberly Easter, hereafter styled the complainant, namely, striking the complainant, an infant, with his hands and fists, choking the complainant with his hands, and by throwing and dropping the complainant on the floor and by using other instruments and means against the complainant unknown to the grand jury."

The court, in *Easter,* supra, concluded:

"The felony murder rule as now embodied in the present penal code dispenses with inquiry into the mens rea accompanying the homicide itself. The underlying felony—here the injury to a child—supplies the necessary culpable mental state. The indictment was not fundamentally defective so as to be susceptible to challenge for the first time in a post-conviction writ of habeas corpus. *Ex parte Bailey,* 600 S.W.2d 331, 332 (Tex.Cr.App.1980). See also *Garrett v. State,* 573 S.W.2d [543] at 545 [ (Tex.Cr.App.1978) ]; *Rodriguez v. State,* 548 S.W.2d at p. 28."

In *Easter,* supra, in an opinion authored by then Commissioner Quentin Keith and approved by this Court, reliance was had upon a case authored by Commissioner Reynolds and approved by this Court. *Rodriguez v. State,* 548 S.W.2d 26 (Tex.Cr.App.1977). In *Rodriguez,* supra, prosecution also was had upon an indictment under V.T.C.A. Penal Code, Section 19.02(a)(3), supra. At pages 28 and 29, this Court in *Rodriguez,* supra, stated:

"Initial attention is given to the fourth ground of error claiming that Section 19.-02(a)(3) is unconstitutional for vagueness and indefiniteness. The infirmity is contended for on the theory that the Section fails to show what culpable state of mind is required in the commission of the '*act*

clearly dangerous to human life that causes the death of an individual.' The novel contention has not heretofore been decided and, to resolve it, the enactment must be considered with other sections of the penal code, to which the rule of strict construction does not apply. Section 1.05 . . . .

"From the consideration of these Sections together, it logically follows that because Section 19.02(a)(3) is silent as to, and does not plainly dispense with, the culpable mental state required for the underlying felony committed or attempted, Section 6.02(b) mandates that the culpable mental state shall, as specified in Section 6.02(c) be one of intent, knowledge or recklessness. Upon the establishment of the underlying committed or attempted felony embracing the requisite mental state, Section 19.02(a)(3) then declares that an act which is committed in the course and furtherance of, or in immediate flight from, the underlying committed or attempted felony and which is clearly dangerous to human life and causes death, shall constitute murder. Thus, the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying committed or attempted felony giving rise to the act. The transference of the mental element establishing criminal responsibility for the original act to the resulting act conforms to and preserves the traditional mens rea requirement of the criminal law."

The most recent case that this author could find in which a prosecution was had under V.T.C.A. Penal Code, Section 19.-02(a)(2), was in the panel decision by this Court in *Bowen v. State*, 640 S.W.2d 929 (Tex.Cr.App.1982). In *Bowen*, supra, the indictment alleged that appellant did:

"then and there intend to cause serious bodily injury to Timothy Harless, hereafter styled the complainant, and did cause the death of the complainant by committing an act clearly dangerous to human life, namely, by beating him . . . with his hands and fists."

The appellant in *Bowen*, supra, challenged the indictment as being fundamentally defective, although appellant did not challenge said indictment on grounds similar to the case at bar. A panel of this Court in *Bowen*, supra, concluded:

"Here, the pleader alleged all elements of the offense charged—and more. That 'beating . . . with his hands and fists' is not necessarily 'clearly dangerous to human life' does not render the indictment fundamentally defective."

It would appear that the indictment in *Bowen*, supra, and in the case at bar, insofar as alleging an offense under Section 19.02(a)(2), supra, are identical. The panel in *Bowen*, supra, found no fundamental defect in said indictment.

Bearing in mind the teachings of *Teniente*, supra, *Jones*, supra, *Bermudez*, supra, *Clark*, supra, *Martinez*, supra, *Jason*, supra, *Prophet*, supra, *Santellana*, supra, *Ex parte Easter*, supra, *Rodriguez*, supra, and *Bowen*, supra, we turn to the indictment in the case before us. The culpable mental state required by Section 6.02, supra, is supplied in the indictment in the case at bar by the phrase: ". . . intending to cause serious bodily injury." Murder under Section 19.-02(a)(1), supra, is a "result" type of a crime. It is committed when the conscious objective or desire of the perpetrator was to cause death or where the perpetrator was aware that his conduct was reasonably certain to cause death. See V.T.C.A. Penal Code, Section 6.03(a) and (b). When the culpable mental states of *intentionally* and *knowingly* are attached to the result of death, criminal homicide then possesses the basic characteristics of its family required by V.T.C.A. Penal Code, Section 19.01(a) and (b).

It is axiomatic that when an individual embarks upon conduct that is intended to cause death and he achieves the result of death, he does so by committing an act clearly dangerous to human life. Noting however, that, while an act clearly dangerous to human life usually occurs, it is not required to prove up murder under Section 19.02(a)(1), supra. The culpable mental

state, the intent to cause death, focuses upon the result and does not impose any limitation on the manner and means by which the death is achieved. Ergo, if with the intent to cause death, an individual throws a small stone at an individual and kills him, the perpetrator is guilty of murder not withstanding that the act resulting in the death was not *clearly* dangerous to human life. It is sufficient that the perpetrator intended to cause death and achieved that objective with a small stone or a hand grenade.

Murder under Section 19.02(a)(1), supra, by knowingly causing death, contemplates both the commission of an act clearly dangerous to human life and an awareness of the nature of that act. Applying the definition of "knowingly," a person knowingly causes death "when he is aware that his conduct is reasonably certain to cause the result." Section 6.03(b), supra. In a prosecution under Section 19.02(a)(1), it surely cannot be inferred that the individual was reasonably certain his conduct would result in death unless his conduct in causing death was clearly dangerous to human life. Thus, with respect to a murder under Section 19.02(a)(1), supra, the act, by necessity, must be objectively clearly dangerous to human life and the individual, by definition, must subjectively be aware that the act resulting in the death was clearly dangerous to human life.

■ We also note that murder under Section 19.02(a)(2), supra, is a "result" type of a crime. It is committed when (1) the *individual intends to cause serious bodily injury,* (2) commits an act clearly dangerous to human life that (3) causes the death of an individual. If we apply the definitions of "intent" under Section 6.02(a) and serious bodily injury under V.T.C.A. Penal Code, Section 1.07(a)(34) we conclude that a prosecution under Section 19.02(a)(2), supra, must first show that the individual, acting with the conscious objective or desire to create a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of any bodily member or organ, caused the death of an individual.

Thus, the first element of prosecution under Section 19.02(a)(2) is satisfied.

■ The second element of prosecution under Section 19.02(a)(2) *requires a showing that the individual commits an act clearly dangerous to human life,* i.e., it requires that the act intended to cause serious bodily injury be objectively *clearly dangerous to human life.* Because the definition of serious bodily injury includes serious permanent disfigurement and protracted loss or impairment of a bodily member or organ, it does not necessarily follow that an act that intended to cause serious bodily injury was also intended to be clearly dangerous to human life. Since an act that was intended to cause serious bodily injury may not have been intended to be clearly dangerous to human life, the statute requires that the character of the act be measured by an objective standard. Thus, while an individual may be convicted of murder under Section 19.02(a)(1), supra, by intending to cause death notwithstanding that the act resulting in death was not objectively clearly dangerous to human life, the individual could not be convicted of murder under Section 19.02(a)(2), supra, by intending to cause serious bodily injury unless the act resulting in death was objectively *clearly dangerous to human life.* Ergo, by authorizing a conviction for murder by intending to cause death by an act, regardless of its magnitude, or by intending to cause serious bodily injury, by an act clearly dangerous to human life, the legislature has determined that 19.02(a)(1) and (a)(2), supra, are functionally equivalent. Thus, the requirement of a culpable mental state under Section 19.01(a), supra, is satisfied when it is established that the individual, with the intent to cause serious bodily injury, commits an act clearly dangerous to human life that results in death. The effect of the panel opinion in requiring that a culpable mental state of "intentionally or knowingly" be applied to the conduct that is clearly dangerous to human life, was to change the character of murder under Section 19.02(a)(2), supra, from a "result" type of a crime to a "result" and "conduct" type of a crime. Section

19.02(a)(2), supra, clearly by its terms, focuses the mental state of the individual on the particular result and not on the conduct that causes death.

It is apparent from the reading of *Teniente,* supra, *Jones,* supra, *Bermudez,* supra, *Clark,* supra, *Martinez,* supra, *Jason,* supra, *Ex parte Prophet,* supra, *Ex parte Santellana,* supra, *Ex parte Easter,* supra, *Rodriguez,* supra and a legion of other cases, that this Court and the various Court of Appeals have dealt with the question of whether an indictment sufficiently prescribes the required culpable mental state or states, on a case-by-case basis. i.e., an indictment by indictment basis and a statute-by-statute basis. This approach has been mandated by the fact that the proposed Section 6.06, supra, was not enacted by the legislature,[3] and this Court declines to do that which is prohibited by the State Constitution. See Article II, Section 1, Texas Constitution.[4]

We hold that the indictment in the case at bar was not fundamentally defective and that it contained the requisite culpable mental state as required by Section 6.02, supra, and Section 19.02(a)(2), supra.

■ We now turn to the two grounds of error raised in the appellant's brief but not heretofore addressed by this Court. In ground of error number one appellant asserts the trial court erred in admitting and considering appellant's confession because appellant was not warned by the person to whom the statement was made as required by Article 38.22, V.A.C.C.P.

Pertinent to our inquiry are the following statutory provisions contained in Article 38.22, V.A.C.C.P.:

"Section 2. No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:

"(a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person from whom the statement is made a warning that:

"(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

"(2) any statement he makes may be used as evidence against him in court;

"(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

"(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

"(5) he has the right to terminate the interview at any time; and

"(b) the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section."

Appellant correctly asserts that his confession was introduced by the State in its case in chief over appellant's objection; that at 9:50 a.m. on the 21st day of November, 1977, appellant was warned by Tony Barrio of his rights under Article 38.22, supra, prior to making any statement; and that Mr. Barrio testified that, "They, [appellant, Mrs. Hilbert and Mrs. Ybarra] went into another room and I don't know what happened. Mrs. Hilbert later came back and told me, said, 'Thank you, he gave us a full confession.'" A thorough review of the record, however, reveals that Mr. Bar-

3. The science of legislation is like that of medicine in one respect: that it is far more easy to point out what will do harm than what will do good. Charles Caleb Colton, Lacon (1825) 1.529.

4. The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to-wit: those which are Legislative on one; those which are Executive to another, and those which are Judicial to another; *and no person, or collection of persons, being of one of those departments, shall exercise any power properly attached to any of the others,* except in the instances herein expressly permitted.

rio, Mrs. Hilbert, and Mrs. Ybarra were all present in the same room with appellant when appellant was advised of his rights (in the Spanish language) pursuant to Article 38.22, supra.

Appellant's handwritten confession appears in the record as State's Exhibit No. 11. This confession is signed by the appellant David Lugo-Lugo and was witnessed at 10:25 a.m. on the 21st day of November, 1977, by Mary Hilbert, and Grace Ybarra. The testimony of Tony Barrio as to the taking of the statement and as to whom was present when same was taken, is as follows:

"Q. [PROSECUTOR]: At any time during the polygraph examination, or after its conclusion, did the defendant in this case, David Lugo-Lugo, indicate to you that he was willing to make a statement to the police?

"A. Yes, sir, he did. At the completion of the . . .

"Q. All right. I will hand you what has been marked as State's Exhibit No. 11, and I will ask you to look at that and especially the top portion of State's Exhibit No. 11 and ask you if you can identify that?

"A. Yes, sir. This document, and especially the top portion of the document, the top portion of the document was filled out in my hand writing in Mr. Lugo-Lugo's presence and this was made immediately after the completion of the examination in the room adjacent to the polygraph examination room.

"Q. All right. Who was present when this top part was filled out?

"A. Myself, the officer that was in charge of the case, Mary Hilbert, who is the juvenile officer there.

"THE COURT: I'm sorry, who?

"THE WITNESS: Mary Hilbert, juvenile officer for Killeen Police Department.

"A. And also Mrs. Grace Ybarra. I believe her—I don't know her proper title, but she is a full-time employee of the Killeen Police Department."

Barrio testified further that at the conclusion of giving the warnings required by Article 38.22, supra, in the presence of appellant and Mrs. Ybarra and Mrs. Hilbert, Tony Barrio exited the examination room. Grace Ybarra offered further testimony concerning the circumstances surrounding the taking of appellant's confession as evidence in State's Exhibit No. 11:

"Q. [PROSECUTOR]: Okay. And where was the statement taken?

"A. In the CID area of the Killeen Police Department.

"Q. All right. Now, the top portion of State's Exhibit No. 11 contains statutory warnings 1 through 5, and I'll ask you if you were present when these warnings at the top of State's Exhibit No. 11 were given to the defendant in this case?

"A. I was."

* * * * * *

"Q. All right. Now, if you will, would you tell the court who explained the rights to him on the top of State's Exhibit No. 11?

"A. Mr. Barrio explained it to him."

* * * * * *

"Q. All right. Now, I'll ask you what happened, or what did you do in reference to this statement once Mr. Barrio gave you the form and released the defendant to you and Mrs. Hilbert?

"A. I translated it to—from the written Spanish into English, and I typed it."

It is obvious from the testimony offered by Barrio, Hilbert, and Ybarra, and from the reading of State's Exhibit No. 11 (appellant's confession) that appellant, Hilbert, Ybarra, and Barrio were all present during the time that appellant was warned pursuant to Article 38.22, supra. It is of no moment that Mr. Barrio left the interview room after appellant was warned and that Mrs. Hilbert and Mrs. Ybarra proceeded to take the statement of appellant. We find this ground of error to be without merit.

Appellant in his second ground of error asserts that the trial court erred in admit-

ting and considering appellant's confession because appellant's confession was illegally obtained by coercion by use of a polygraph examination and photographs of the deceased. Appellant cites as authority for ground of error number two the following authorities: *Prince v. State,* 155 Tex.Cr.R. 108, 231 S.W.2d 419 (Tex.Cr.App.1950); *Davis v. State,* 165 Tex.Cr.R. 456, 308 S.W.2d 880 (Tex.Cr.App.1958), and *Fernandez v. State,* 172 Tex.Cr.R. 68, 353 S.W.2d 434 (Tex.Cr.App.1962).

In *Prince v. State,* supra, the appellant was shown to have been subjected to lengthy interrogation at intervals by police officers and prosecuting attorneys from the afternoon of May 25 to the early morning hours of May 28. The appellant did not confess until he had been returned to his home, the scene of the crime. This Court held that appellant's confession under those facts was involuntary.

In *Davis v. State,* supra, the appellant was interrogated on January 23; taken into custody on January 24; and subjected to persistent questioning until he confessed on January 28. During this time the appellant was moved from jail to jail and held incommunicado from friends and relatives. During the interrogation, the appellant had been shown a bloody picture of the deceased and required to hold it for twenty-five minutes. This Court held that under these facts the appellant's confession was involuntary as a matter of law, and in doing so, stressed the importance of the prolonged questioning and the holding of appellant incommunicado.

■ In *Fernandez v. State,* supra, the evidence showed that the deceased was killed in a fight about 11:00 p.m. on March 12. The appellant was arrested about 1:30 a.m. on March 13. The appellant was questioned by the sheriff and placed in jail about 3:00 a.m. The next morning, the appellant was again questioned by the sheriff at which time appellant gave information leading to the recovery of a knife. On the afternoon of March 14, the appellant was taken for a lie detector test. After that test, about 5:00 p.m., the appellant

gave a written statement. This Court in *Fernandez,* supra, distinguished *Prince,* supra, on the ground that appellant was not taken to the crime scene. This Court held that giving the appellant a lie detector test did not render his confession inadmissible. This Court further held that under the facts shown, the appellant's confession was not inadmissible as a matter of law. The facts of the case at bar are distinguishable from the facts in *Prince,* supra, *Davis,* supra, and *Fernandez,* supra. In the case at bar appellant was not under arrest nor placed in custody until after he had given his statement. (See Statement of Facts page 162.) From a reading of the cold record, this Court cannot determine with any specificity which pictures appellant asserts were used to coerce the appellant into making a confession. In his brief, appellant refers us to page 123 of the Statement of Facts. The following colloquy between appellant's counsel and the witness Barrio comprises the entire testimony concerning the showing of any photographs.

"Q. [APPELLANT'S COUNSEL]: Mr. Barrio, did you in fact strap him up to the polygraph machine and talk with him?

"A. Yes, sir, I did give him a polygraph examination.

"Q. Okay. During, or immediately after that—immediately prior to it you have a period of time when you discuss things with the defendant, kind of prepping him for the polygraph examination, do you not?

"A. Yes, sir. The pre-test portion of the examination.

"Q. Did you at that time show him any photographs of the deceased's child?

"A. I may have. In fact, the photographs were available. Yes, sir, I did show him *some,* yes, sir."

The record is completely devoid of what photographs appellant's counsel was referring or what photographs Mr. Barrio testified he showed to appellant. Therefore, nothing is preserved for review.

As to appellant's assertion that his confession was illegally obtained by coercion

through the use of a polygraph examination the record reveals that:

■ Tony Barrio testified that on November 21, 1977, he advised the appellant of his rights in Spanish; that appellant read his rights in Spanish; that appellant did not request a lawyer; that appellant signed the document in Tony Barrio's presence and indicated that he wanted to proceed; that Tony Barrio gave the appellant a polygraph examination; that after the examination he advised the appellant as required by law of the results of the examination which indicated that the appellant had not told the complete truth; that the appellant verbally confessed his participation in the crime to Mr. Barrio; that Mr. Barrio contacted Officers Hilbert and Ybarra; that Mr. Barrio read to the appellant in Spanish the *Miranda* warnings contained at the top of State's Exhibit No. 11 (Appellant's confession); that the appellant had no questions regarding his rights and made no requests; that neither witnesses Barrio, Hilbert or Ybarra used any force or made any threats or promises in order to get the appellant to make a statement. The trial court entered findings of fact and conclusions of law that the confession was obtained voluntarily and in compliance with the Constitution and laws of this State and of the United States. See *McDonald v. State*, 631 S.W.2d 237 (Tex.App.1982). Appellant's second ground of error is overruled.

The State's motion for rehearing is granted and the judgment of the trial court is affirmed.

1. All statutory citations in this opinion are to the 1974 Penal Code and will hereafter be cited only by section number.

2. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

3. Section 1.07(a)(8) defines "conduct" as "an act or omission and its *accompanying mental state*."

In turn, § 1.07(a)(13) includes as "element of offense," *inter alia:*
"(A) the forbidden *conduct;*
(B) the *required culpability;*
(C) any required result . . . "

CLINTON, Judge, concurring.

The motion for rehearing filed in this case—nearly 10 years after the adoption of the 1974 Penal Code—and the difficulty presented by the spectre of its resolution, serve to press upon us the necessity of a studied and rational reconsideration of the issue presented: how are this Court and lower criminal courts to analyze and determine whether a "culpable mental state" must be superimposed both conceptually and literally upon the otherwise express requisites of a criminal offense?

By now it is painfully apparent to all that in analyzing this question in any given case, it is not sufficient that one only advert to V.T.C.A. Penal Code, § 6.02,[1] which provides in part:

"(b) If the definition of an offense does not prescribe a *culpable mental state,* a culpable mental state is nevertheless required unless the definition plainly dispenses with *any mental element.*"[2]

What is a "culpable mental state?" Is a "mental element" the same thing? What is an "accompanying mental state?"[3] Is it a "mental element" or a "culpable mental state," or both, or neither? What is the relationship between criminal "conduct" and a "culpable mental state," if any? Does the "required culpability" have an indispensable nexus with "results" society condemns through penal prohibitions? In sum, what is the function of "required culpability" in the criminal law?

These questions, among others, remain unanswered to date.[4] Convinced that a

4. One reason for these questions is that after the 62nd Legislature failed to enact the penal code proposed in 1970 and before the revised code was finally adopted by the 63rd Legislature in 1973, the original definitions of "Element of Offense" was "garbled in transition," Practice Commentary following § 1.07. Thus, "(A) the conduct, circumstances surrounding the conduct, or result of the conduct described in the definition of the offense" became "(A) the forbidden conduct" and "(B) the culpable mental state required" turned "(B) the required culpability." Compare *ibid.* with § 1.07(a)(13).

Similarly, with "Requirement of Culpable Mental State;" § 6.04(a) in the initially proposed code provided:

reading of Chapter 6 as a whole must provide the answers, we proceed to a *de novo* analysis of the intent and substance of the provisions contained there.

## A. ELEMENTS OF CONDUCT

Section 6.03, entitled "Definitions of Culpable Mental States," was adopted in substance by the Legislature without modification from § 6.05 of the Texas Penal Code, *A Proposed Revision,* State Bar Committee on Revision of the Penal Code, (Final Draft 1970). In the Committee Comment to proposed § 6.05, it was observed:

> "One additional aid to analysis incorporated in the new code should be mentioned before discussing the definitions of the culpable mental states set out in this section. *The code distinguishes three types of [conduct] elements: the nature of the conduct, the circumstances surrounding the conduct, and the result of the conduct.* Although the definitions of most offenses prescribe the same culpable mental state for each type of element, some do not, and *it is necessary to distinguish the types of elements to avoid confusing the proof requirements* for these offenses." [5]

### 1. *Nature of Conduct*

With this legislative history aid to our analysis in mind, it is apparent upon reading § 6.03 [6] that the "nature of conduct" must either be "the conscious objective or desire" of the actor (intended), or be something of which the actor is "aware" (known). A person cannot be reckless or

---

5. This passage from the Committee Comment continues with the following instructive examples:

"... [S]ection 30.03 defines criminal trespass as entering another's property *knowing* the entry is without the owner's consent (circumstances surrounding conduct) and *reckless* about whether the entry will frighten another (result of conduct). Another example is false imprisonment, Section 20.02: an *intentional* or *knowing* detention (nature of conduct) becomes a felony if it *recklessly* exposes the victim to a substantial risk of serious bodily injury or death (result of conduct)." [Original emphasis]

6. For the reader's convenience and ready reference, the text of § 6.03 is set out here in its entirety.

"Except as provided in Subsection (b), a person does not commit an offense *unless he acts intentionally, knowingly, recklessly, or with criminal negligence, as the definition of the offense requires* ...."

But the new code provision in § 6.02 changed the "unless" clause to read:

"unless he intentionally, knowingly, recklessly, or with criminal negligence *engages in conduct* as the definition of the offense requires."

The introduction of "conduct" had the unforeseen consequence of implicating the § 1.07(a)(8) definition of that term: "an act or omission and its accompanying mental state," that to commit an offense one must have a "culpable mental state" *and* also must act with an "accompanying mental state."

Considering such changes to be matters of form rather than substance will obviate some of the questions.

"(a) A person acts *intentionally,* or with intent, with respect to the *nature of his conduct* or to a *result of his conduct* when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts *knowingly,* or with knowledge, with respect to the *nature of his conduct* or to *circumstances surrounding his conduct* when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a *result of his conduct* when he is aware that his conduct is reasonably certain to cause the result.

(c) A person acts *recklessly,* or is reckless, with respect to *circumstances surrounding his conduct* or the *result of his conduct* when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

(d) A person acts with *criminal negligence,* or is criminally negligent, with respect to *circumstances surrounding his conduct* or the *result of his conduct* when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."

negligent with respect to the "nature of conduct."

### 2. Circumstances Surrounding Conduct

Nor can a person "intend" "circumstances surrounding his conduct;" at most he may be "aware of" (know) the existence of such circumstances. And certainly he may be "aware of but consciously disregard" the existence of such circumstances (reckless), as well as "fail to perceive" a substantial, unjustifiable risk, of which he ought to be aware, that the circumstances exist (criminally negligent).

### 3. Result Of Conduct

Any of the four culpable mental states defined in § 6.03 may apply to "result of conduct:" a person may: consciously desire the result (intend); be aware that his conduct is reasonably certain to cause the result (know); be aware of but consciously disregard a substantial and unjustifiable risk that the result will occur (reckless); or fail to perceive a substantial and unjustifiable risk, of which he ought to be aware, that the result will occur (criminally negligent).

## B. INTENT OF CHAPTER 6

Viewed from this perspective these provisions indicate the Legislature intended that, *generally,* some genre of culpability is required for each element of conduct discussed (the nature of, the circumstances surrounding, and the result of the conduct) —subject, however, to plain wording of a statute, read in context, which indicates an intent to dispense with a culpability requirement for any or all of the conduct elements contained there.

Furthermore, we believe that the rules of grammar and common sense ordinarily will require a culpable mental state, that does not specify conduct, circumstances surrounding conduct or result of conduct to

which it applies, to be read to apply to each element of the conduct which follows it— particularly when used at the beginning of a penal proscription (or alleged at the beginning of a charging instrument).[7]

## C. THIS CASE

### 1. The Statute

Applying this analysis to the instant case, we naturally begin with the statute in issue:

"(a) A person commits an offense if he:

\* \* \* \* \* \*

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; \* \* \* "

Section 19.02.

### 2. The Conduct Elements

The second step involves determining the conduct elements of the offense in terms of "nature of conduct," "circumstances surrounding conduct" and "result of conduct." In doing this it is helpful to visualize a chart:

| Nature of Conduct | Circumstances of Conduct | Result of Conduct |
|---|---|---|
| (intends to cause serious bodily injury) [by] committing an act | | death of an individual |

### a. nature of conduct (an act and its accompanying mental state)

Coupled with the proscribed act is the intent that the act will *result* in serious bodily injury. Notwithstanding the fact that "serious bodily injury" includes "death," § 1.07(34), it is safe to say the statute addresses an intended "result"

---

**7.** In this conclusion we give no legal significance to the fact that the Legislature failed to adopt § 6.06 of the proposed code which provided a similar rationale. As stated, our determination is founded on grammar and common sense.

We also note that, generally, proscriptions which employ "recklessness" or "negligence" do confine the application of those mental states to specific elements of conduct. Thus, the rule we announce will virtually always apply only to use of "intentionally" or "knowingly."

Finally, we observe that some elements of conduct are set out in such a way that it is obvious from the context that a mental state previously set out does not apply to those elements.

which may be less serious than, and different from, the actual "result."

We believe that this is what the code contemplates to be an "accompanying mental state."

Anytime the result intended by the actor is unnecessary to commission of the offense charged, or is different from the actual result, it is an "accompanying mental state" which provides the requisite culpability to the "conduct" or "nature of the conduct," and we so hold. Another way to view it is that the "conduct" is the means the actor employs to effect the "result" he intends. Conceptualized in this way, the "conduct" and the "accompanying mental state" are, literally, inseparable.

Thus, in this case, the "intent to cause serious bodily injury" applies to the "act" committed: the person acts with intent with respect to the nature of his conduct because it is his conscious objective or desire to engage in conduct that will result in serious bodily injury. See § 6.03(a). Restated, he intends to cause serious bodily injury through his commission of the culpable "act."

In sum, the statute itself provides a culpable mental state for the "nature of the conduct" proscribed therein.

### b. *result*

The statute does not specifically provide a separate culpable mental state for the "result" of this offense which is "death." Does the statute plainly dispense with the requirement that the actor *intend* the resulting death? We believe it does. This is a significant and obvious distinction between § 19.02(a)(2) and § 19.02(a)(1), the "intentional" murder statute.[8]

### c. *"clearly dangerous to human life:" nature of the conduct or circumstances surrounding conduct?*

The most difficult question presented in this case is whether the statute's description of the "act" as one which is "clearly dangerous to human life" is part of the "nature of conduct" or refers to "circumstances surrounding conduct."

Obviously, circumstances surrounding conduct could make an otherwise benign act dangerous. Thus, if we were to determine the phrase in issue is a "circumstance surrounding the conduct," an additional culpable mental state as to that "conduct element" would be required.[9]

However, upon careful analysis of the statute in question, we are convinced that "clearly dangerous to human life" is part and parcel of the "nature of conduct" proscribed there.

We conclude this primarily for two reasons. Grammatically, the phrase unquestionably is adjectival and modifies and describes the noun "act." Further, the word "clearly" indicates an objective recognition by all (including the actor)[10] that the act committed threatens or risks a resulting death;[11] accordingly, the "danger" contemplated by the statute is inherent in the "act" and not dependent upon unique "circumstances" of which the actor may not be aware.

### 3. *Are Additional Mental States Required?*

Having determined the phrase "clearly dangerous to human life" is a part of the

---

**8.** The question of whether the "result" requires the addition of a culpable mental state less than "intentional" is discussed *post* at 89.

**9.** As has been demonstrated, however, "circumstances surrounding conduct" cannot be "intended." Section 6.03(a).

**10.** "Clearly" is the adverbial form of "clear;" some definitions and synonyms of the latter, *inter alia,* are:

"unmistakable ... capable of sharp discernment ... free from doubt: sure ... unqualified, absolute ... 'clear' implies freedom

from obscurity, ambiguity, or undue complexity ... evident."

Webster's Seventh New Collegiate Dictionary (1969).

**11.** The statutory definition of "serious bodily injury" lends additional support for this conclusion:

" 'Serious bodily injury' means bodily injury that creates a substantial *risk of death* or that *causes death,* serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

"nature of conduct" proscribed by § 19.-02(a)(2), we return to the completion of our chart:

| Nature. . . | Circumstances Surrounding. . . | Result. . . |
|---|---|---|
| (intends to cause serious bodily injury) [by] committing an act [which is] clearly dangerous to human life | | death of an individual |

#### a. *nature of conduct*

With the completed chart we are prepared to proceed to the third and final step required by our analysis. We first observe the "intent" contained in the "accompanying mental state" applies to the entire "nature of conduct:" "an act clearly dangerous to human life."

#### b. *circumstances surrounding conduct*

Since we have no "circumstances surrounding the conduct" in this offense, we need not address culpability for that "element of conduct."

#### c. *result of conduct*

Returning to the question of whether the "result of conduct" (death) requires an additional culpable mental state less than "intended,"[12] we hold it does not. In reading the statute as a whole, it is apparent that the risk of death is inherent in the actor's intentional conduct. And though he may not necessarily intend that death result, he intends a result in which death is a possibility. We are convinced that this is all the Legislature meant to require for commission of the instant offense.

For the above reasons, we would hold the indictment underlying appellant's conviction—which is alleged in the language of § 19.02(a)(2)—is fundamentally sufficient to support a conviction. Since as we understand it, the majority opinion applies an analysis which focuses more on provisions of criminal homicide sections in Chapter 19 to reach the same result, we concur with the essence of that opinion and with the judgment of the Court.

ODOM, TEAGUE and MILLER, JJ., join this opinion as well as the majority opinion.

---

12. See *ante* at 88 and n. 8, where we determined the statute plainly dispenses with the necessity that the actor "intend" the result of his conduct (death), but left open the question of whether a lesser culpable mental state is required.