# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
          )   DIVISION ONE
        Respondent, )
          )   No. 71134-2-I
       v. )
          )   ORDER GRANTING MOTION
KEVIN LEE GARRISON, )   FOR RECONSIDERATION, IN
          )   PART, DENYING MOTION FOR
        Appellant. )   RECONSIDERATION, IN PART,
          )   WITHDRAWING OPINION, AND
_____ )   SUBSTITUTING OPINION

The respondent, State of Washington, has filed a motion for reconsideration of the opinion filed on April 6, 2015. Appellant has filed a response. The court has determined that said motion should be both granted, in that the court's analysis must be modified, and denied, insofar as the State seeks a change in the relief denied and afforded to appellant. Hence, the unpublished opinion filed on April 6, 2015 shall be withdrawn and a substitute unpublished opinion shall be filed. Now, therefore, it is hereby

ORDERED that the motion for reconsideration is granted, in part, and denied, in part; it is further

ORDERED that the opinion filed on April 6, 2015 is withdrawn and a substitute unpublished opinion shall be filed.

DATED this ___8th___ day of ___September___ 2015.

2015 SEP -8 AM 9:08
COURT OF APPEALS DIV I
STATE OF WASHINGTON

_____
                Cox, J.

_____
Spearman, C.J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | No. 71134-2-I |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| KEVIN LEE GARRISON, | ) | |
| | ) | |
| Appellant. | ) | FILED: September 8, 2015 |
| | ) | |

DWYER, J. — Kevin Lee Garrison was found guilty of child molestation in the second degree for touching the breasts of a sleeping 12-year-old girl. He was sentenced to life in prison as a persistent offender. On appeal, Garrison contends that (1) the trial court improperly admitted ER 404(b) evidence that he had touched the same victim on other occasions and that he had committed similar acts against another young girl approximately 10 years before, (2) the trial court's limiting instruction with respect to this ER 404(b) evidence was incorrect, and (3) he was improperly sentenced as a persistent offender because one of his prior convictions was comparable to a Washington class C felony, not a class B felony, and, therefore, should not have been included in his offender score or deemed to be a strike offense. Because Garrison does not establish an entitlement to relief on either the evidentiary or instructional issues, we affirm the conviction. However, because one of his prior convictions was improperly counted as a strike offense, we reverse the sentence imposed and remand for further proceedings.

I

A.W. was twelve years old and in sixth grade in December of 2011. She spent a significant amount of time at the home of her best friend, Sincerity, including spending the night there three or four times a week. Garrison was Sincerity's stepfather. A.W. considered Garrison and Sincerity's mother, Rosie Garrison, to be like family, and called them "Uncle Kevin" and "Aunt Rosie." Garrison, in turn, bought A.W. gifts and was kind to her.

Normally, when A.W. wanted to spend the night at the Garrisons' house, she would call her mother to ask permission. One night in December of 2011, however, it was Garrison who called A.W.'s mother to ask if A.W. could spend the night. A.W.'s mother gave permission, and spent part of the evening at the Garrisons' home herself, socializing with the Garrisons.

When A.W. spent the night at the Garrisons' house, she frequently shared Sincerity's bed, but also sometimes slept on the family's living room couch. After A.W.'s mother went home on the night in question, Garrison and Rosie went to bed and A.W. went to sleep on the couch. A.W. was wearing a shirt, bra, zip-up hooded sweatshirt, and jeans. Before going to sleep, A.W. zipped her sweatshirt all the way up.

Shortly before 5:00 in the morning, A.W. was awakened by the feeling of a hand rubbing and squeezing her breast underneath her bra. She opened her eyes and saw Garrison withdraw his hand from her chest and quickly walk back to his bedroom a few feet away. A.W. discovered that her sweatshirt was unzipped, the neckline of her shirt was pulled down below her bra, and the cup of

her bra was folded inwards, exposing part of her breast and nipple. A.W. fixed her clothes and turned to face the back of the couch, with her back toward Garrison's open bedroom doorway, hoping that Garrison would think she was still sleeping. After a minute or two, Garrison came out of his bedroom and went to the kitchen. Garrison returned to his bedroom soon thereafter. A.W. waited a few minutes in the hope that he would fall asleep, then fled to Sincerety's room.

Upon entering Sincerety's room, A.W. climbed into the far side of Sincerity's bed, placing Sincerity between her and the doorway. Fearing that Sincerety would not believe her, she did not tell her what had happened. A.W. forced herself to go back to sleep.

Upon arising for the day, and believing that Garrison would be suspicious if she acted unusually, A.W. acted as if nothing was wrong. Despite her reluctance to get into a car with him, as was customary, A.W. accepted a ride home from Garrison. Garrison said nothing during the short ride. When she arrived home, A.W. found that her mother had already left for work and her aunt was still asleep. A.W. decided to go to school but tried to reach her mother throughout the day. When her mother finally arrived home that night, a tearful A.W. met her in the driveway and told her what had happened the night before. The next day, A.W.'s mother took her to the police station to report what Garrison had done.

The State charged Garrison with child molestation in the second degree. During pretrial motions, the State requested a ruling on the admissibility of evidence of prior sexual misconduct by Garrison against both A.W. and a prior

- 3 -

victim, A.F. Some of the evidence proffered by the State was that, while sleeping on the Garrisons' couch a month or two before the charged incident, A.W. had awakened to Garrison rubbing her upper thigh over her clothes. When she moved her leg, Garrison stopped. Because she trusted Garrison not to do anything inappropriate, A.W. did not think it was serious and went back to sleep.

The State also sought to admit the testimony of A.W. that, on several occasions prior to December of 2011, she had awoken on the Garrisons' couch with her shirt and bra in disarray, but did not know how that had occurred. This only happened when A.W. slept on the couch, and never when she slept in Sincerity's bed.

The State also sought to admit evidence that Garrison had previously molested another young girl, A.F. During the summer of 2000, A.F. was twelve years old and had just finished sixth grade. Her mother was dating Garrison, who lived next door. Like A.W., A.F. was more physically developed than most girls her age. Garrison was kind to A.F., and she began to view him as a father- or uncle-like figure.

One night, A.F. was awakened by Garrison rubbing her head and shoulders. Though A.F. found it awkward, she did not mention this to anyone at the time. On a later occasion, A.F. awoke to find Garrison touching her back with his hands under her clothes. He then moved his hands to fondle her breast and touch her vaginal area. A.F. pretended that she was asleep throughout the incident.

A.F. did not immediately report the molestation both because she did not

want to hurt her mother and because she feared she would not be believed. In the ensuing months, A.F. was awakened more than 20 times by Garrison fondling her. The molestation escalated to more serious abuse that occurred while A.F. was awake, including incidents of vaginal penetration with Garrison's fingers and with a dildo. A.F. eventually disclosed the abuse, and Garrison was charged with rape of a child and child molestation in 2004 but, pursuant to a plea agreement, was allowed to enter an Alford[1] plea to assault in the second degree.

The State argued that evidence of the prior misconduct with A.W. was admissible for the purposes of demonstrating lustful disposition, res gestae, and absence of mistake, and that testimony concerning the prior misconduct with A.F. was admissible for the purposes of demonstrating a common scheme or plan and the absence of mistake. The State indicated that it believed lustful disposition and common scheme or plan were essentially the same concept when considering prior misconduct against the victim of the current offense. The State's argument regarding the absence of mistake was that, because evidence of a common scheme or plan was relevant to prove that the charged act had in fact occurred, the evidence would contradict Garrison's expected claim that A.W. was mistaken in her belief that Garrison had touched her and had instead simply dreamed about it.

The trial court ruled that testimony about the thigh-touching incident with A.W. and the incidents of touching while A.F. was asleep were admissible. The court found that the incidents involving A.W. awakening with her clothing in

---

[1] North Carolina v. Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

disarray were insufficiently connected to any action by Garrison for their relevance to outweigh their prejudice, and excluded evidence of those incidents. The court also found that evidence of the incidents of more serious molestation of A.F., after Garrison had progressed from fondling A.F. while she slept to molesting her while she was awake, was not admissible. The trial court reasoned that this evidence was not helpful to the jury because the incidents described were less similar to the conduct alleged by A.W. than were the incidents that occurred when A.F. was asleep. The trial court did not explicitly state for which purposes evidence of the thigh-touching incident with A.W. was admissible, but did state that evidence of the incidents of molestation while A.F. was asleep were admissible as evidence of a common scheme or plan and the absence of mistake.

The parties later submitted proposed limiting instructions setting out "common scheme or plan" and "absence of mistake or accident" as permissible purposes for A.F.'s testimony in accordance with the court's ruling. The State's proposed instruction set out "lustful disposition" and "absence of mistake" as permissible purposes for A.W.'s testimony concerning prior misconduct. However, Garrison's proposed instruction listed "absence of mistake or accident" as the only permissible purpose for this testimony.

Garrison's counsel argued that the term lustful disposition was unduly prejudicial and that the term common scheme or plan could be substituted for it. The trial court agreed with Garrison's counsel and clarified that, in any case, its pretrial ruling had admitted the prior misconduct with A.W. as evidence of a

common scheme or plan and lack of accident, similar to the evidence of prior misconduct with A.F. The trial court crafted and gave the jury its own instruction. Instead of differentiating between the prior misconduct against A.W. and A.F., this instruction simply stated that testimony concerning the alleged prior sexual misconduct could be considered in evaluating whether the evidence demonstrated a common scheme or plan or absence of mistake or accident.

The jury found Garrison guilty as charged. At sentencing, the trial court found Garrison to be a persistent offender and sentenced him to life in prison without the possibility of release. Garrison timely appealed.

II

Garrison first contends that the trial court erred when it admitted evidence of his prior sexual misconduct. This is so, he asserts, because the prior bad act evidence should not have been admitted for the purpose of establishing absence of mistake or accident. Garrison is correct that this evidence was admitted, in part, for an improper purpose. Nevertheless, the error was harmless.

An appellate court reviews a trial court's interpretation of an evidentiary rule de novo. State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). However, once the rule is correctly interpreted, a trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. DeVincentis, 150 Wn.2d at 17.

Pursuant to ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as

proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

"[A] material issue of accident arises where the defense is denial and the defendant affirmatively asserts that the victim's injuries occurred by happenstance or misfortune." State v. Roth, 75 Wn. App. 808, 819, 881 P.2d 268 (1994), abrogated by State v. Hampton, 182 Wn. App. 805, 332 P.3d 1020 (2014). Evidence is admissible under a lack of accident or absence of mistake theory "only if the defendant actually claims that the charged crime was an accident or mistake, or that he or she was acting in good faith." 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 404.21, at 551 (5th ed. 2007); see, e.g., State v. Dewey, 93 Wn. App. 50, 58, 966 P.2d 414 (1998) (in prosecution for rape, defendant's previous rape of another woman was not admissible to show a lack of mistake; the defendant's defense was consent, not mistake), overruled on other grounds by DeVincentis, 150 Wn.2d 11. In a sex offense case, it is the defendant's claim of accidental touching that triggers the absence of mistake theory of admissibility. There was no such claim in this case.

Garrison did not raise a defense of accident. His defense was that he never touched A.W.'s breasts or intimate parts, not that he touched them by mistake or accident. In fact, the prosecutor argued in closing that there was no evidence of an accidental touching. Likewise, there was no evidence that Garrison had touched A.F. by mistake or accident. A coincidental or mistaken touching was not at issue.

Without citation to relevant authority, the State argued to the trial court that the prior touching of A.W. or A.F. negated the defense theory that A.W. was mistaken in her belief that someone had improperly touched her. That is not the type of mistake that triggers admissibility under an absence of mistake rationale. Indeed, the State's arguments regarding this basis for admission make clear that the State, and as a result the trial court, was using the term "absence of mistake or accident" to express the concept that, because the prior misconduct tended to establish a common scheme or plan, the existence of which tended to make it more likely that the charged misconduct in fact occurred, evidence of the prior misconduct tended to disprove Garrison's claim that A.W. was mistaken in her belief that he had molested her. This framing of absence of mistake or accident rendered the notion functionally equivalent to common scheme or plan, but the two concepts, in fact, are not the same.

Thus, the trial court abused its discretion in basing its ruling on an erroneous view of the law. State v. Quismundo, 164 Wn.2d 499, 504, 192 P.3d 342 (2008); State v. Foxhoven, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). However, this observation does not end our inquiry.

The erroneous admission of ER 404(b) evidence is a nonconstitutional error and is therefore harmless unless there is a reasonable probability that the result of the trial would have been different had the error not occurred. State v. Jackson, 102 Wn.2d 689, 695, 689 P.2d 76 (1984). The admission of ER 404(b) evidence for an improper purpose is harmless if the evidence was also admitted for a proper purpose. See State v. Powell, 126 Wn.2d 244, 264-65, 893 P.2d

615 (1995) (trial court's decision to admit prior misconduct evidence under ER 404(b) will be upheld if one of the bases is justified).

ER 404(b) evidence may be admitted to establish a common scheme or plan. In a child sexual abuse case, evidence of "the existence of a design to fulfill sexual compulsions evidenced by a pattern of past behavior" is relevant to whether the crime occurred. DeVincentis, 150 Wn.2d at 17-18. Admission of evidence for this purpose "requires substantial similarity between the prior bad acts and the charged crime." DeVincentis, 150 Wn.2d at 21. "Sufficient similarity is reached only when the trial court determines that the 'various acts are naturally to be explained as caused by a general plan . . . .'" DeVincentis, 150 Wn.2d at 21 (alteration in original) (quoting State v. Lough, 125 Wn.2d 847, 860, 889 P.2d 487 (1995)). There is no uniqueness requirement; the similarities need not "be atypical or unique to the way the crime is usually committed." DeVincentis, 150 Wn.2d at 13.

With both A.F. and A.W., Garrison gained the victim's trust, and access to her, by being close to someone the victim cared for and also treating the victim with kindness. In the instant case, Garrison established a strong and trusting relationship with A.W. as a result of being often around her. It was only after creating this bond that Garrison molested A.W. as she slept. Likewise, Garrison established a strong relationship with A.F. as a result of the significant amount of time he spent around her. It was only after creating that bond that Garrison started to molest A.F. as she slept. The defendant ingratiated himself with A.W.'s mother, thus ensuring access to A.W. Likewise, Garrison ingratiated

himself with A.F.'s mother to facilitate access to her daughter. By being close to those around A.W. and A.F., Garrison was also able to evade suspicion. While A.W. never lived with Garrison, Garrison and A.W. would often sleep in the same house. Similarly, while Garrison never lived with A.F., Garrison would have access to A.F. multiple times a week when she slept or was getting ready for bed.

Additionally, the first time A.W. woke up to Garrison touching her, he was touching her in a somewhat innocuous manner; specifically, he was rubbing her upper thigh. A.W. did not protest or respond negatively, apparently emboldening Garrison. From there, Garrison's touching progressed to the point where he touched A.W.'s breast as she slept. The touching that A.F. experienced while she slept or was getting ready for bed was similar. First, she woke up to Garrison rubbing her head and back. A.F. did not protest or respond negatively. Later, A.F. was awakened by Garrison's hands touching her breast and vagina.

These significant similarities are naturally explained by Garrison having a general plan. The evidence was properly admitted to show this common scheme or plan. Therefore, any error in the trial court's ruling admitting the same evidence to show an absence of mistake or accident was harmless.

III

Garrison next contends that the trial court erred in the manner in which it analyzed and admitted the ER 404(b) evidence. This is so, he asserts, because the trial court did not properly make a record of its balancing of the probative

value of the evidence against its prejudicial effect. Garrison's argument is unavailing.

"A trial court must always begin with the presumption that evidence of prior bad acts is inadmissible." DeVincentis, 150 Wn.2d at 17. When determining admissibility under ER 404(b), the trial court must (1) find the alleged misconduct occurred by a preponderance of the evidence, (2) identify the purpose for admission, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against its prejudicial effect. Foxhoven, 161 Wn.2d at 175.

"The court's balancing of the prejudicial nature of ER 404(b) evidence must take place on the record." State v. Carleton, 82 Wn. App. 680, 685, 919 P.2d 128 (1996). However, there is no magic words requirement. Thus, where the trial court did not explicitly weigh the probative value of prior misconduct evidence against its prejudicial effect, but admitted only some evidence of the defendant's prior acts while excluding evidence of the acts that were most inflammatory, our Supreme Court concluded that the record as a whole demonstrated that the trial court had fulfilled the requirements of the rule. Powell, 126 Wn.2d at 264-65. Likewise, where the record reflected that the trial court adopted the express argument of one of the parties as to the relative weights of probative value and prejudice, there was no error. State v. Pirtle, 127 Wn.2d 628, 650-51, 904 P.2d 245 (1995). "But these variations serve to reinforce the general rule . . . : the record must in some way show that the court, after weighing the consequences of admission, made a 'conscious determination'

to admit or exclude the evidence." Carleton, 82 Wn. App. at 685 (quoting State v. Tharp, 96 Wn.2d 591, 597, 637 P.2d 961 (1981)).

Here, in making its ruling, the trial court explicitly considered the probative value and prejudicial effect of the testimony the State sought to admit. In explaining why it was admitting evidence of the prior incident in which A.W. awoke to see Garrison touching her thigh, but was excluding evidence of the prior incidents of A.W. awakening with her clothing in disarray for no apparent reason, the trial court stated that the clothing incidents were "too indefinite" compared to the thigh-touching incident. The court explained that the clothing incidents were "highly prejudicial" and there was an insufficient "basis to conclude it's related to [the charged event]."

In explaining why it was admitting evidence of Garrison touching A.F. while she slept but excluding evidence of the more serious abuse that occurred once Garrison started molesting A.F. while she was awake, the court acknowledged that "it is highly prejudicial to have any mention of sexual impropriety with a young person." The court observed that the incidents while A.F. was asleep were nonetheless very similar to the current allegations involving A.W., while the incidents that occurred after Garrison progressed beyond touching A.F. in her sleep were less "helpful to the jury in deciding" whether Garrison was guilty of the charged crime.

At the end of the trial court's oral ruling, the prosecutor asked the court whether it was finding that the probative value of the evidence the court ruled

admissible was not outweighed by its unfair prejudice, and the court confirmed, "That's correct."

Although the trial court's oral ruling may not be as organized and neatly set out as appellate counsel might wish, the record is clear that the trial court did indeed consider the probative value and prejudicial effect of the evidence the State sought to admit in making its rulings. Because the trial court balanced the probative value of the proffered testimony against its prejudice on the record, and only admitted those portions for which the probative value was not outweighed by the danger of unfair prejudice, the trial court properly exercised its discretion in admitting portions of the prior misconduct evidence offered by the State.

However, even were we to conclude that the trial court should have been more explicit in its balancing as to each individual piece of evidence, any error would be harmless. A failure to articulate the balance between probative value and prejudice does not necessarily require reversal. There are at least two different circumstances in which the failure to weigh prejudice on the record, while admitting ER 404(b) evidence, constitutes harmless error. The first is when the record is sufficient for the reviewing court to determine that the trial court, if it had considered the relative weight of probative value and prejudice, would still have admitted the evidence. Carleton, 82 Wn. App. at 686. The second circumstance is when, considering the untainted evidence, the appellate court concludes that the result of the trial would have been the same even if the trial court had not admitted the evidence. Carleton, 82 Wn. App. at 686-87.

The record in this case is sufficient to evaluate these circumstances. The pretrial argument on just the issue of ER 404(b) admissibility spans approximately 70 pages of the verbatim report of proceedings. Each attorney repeatedly spoke at length and both attorneys framed their arguments in terms of the established framework for admitting evidence pursuant to ER 404(b). The trial judge participated by asking questions throughout the argument. This issue was also discussed a number of times at other stages of the proceedings. Here, it is clear from the record that, had the trial court more explicitly articulated its weighing of probative value against prejudicial effect for each instance of prior misconduct evidence, it would still have admitted and excluded the same portions of the proffered evidence. Any error was harmless.

IV

Garrison next contends that the trial court gave an incorrect limiting instruction concerning the ER 404(b) evidence. This is so, he asserts, because the jury should not have been instructed that it could consider this evidence to establish an absence of mistake or accident. Garrison is correct that this purpose should not have been included in the limiting instruction; however, the error was harmless.

If evidence of a defendant's prior crimes, wrongs, or acts is admissible for a proper purpose, the defendant is entitled to a limiting instruction upon request. Foxhoven, 161 Wn.2d at 175; State v. Saltarelli, 98 Wn.2d 358, 362, 655 P.2d 697 (1982). "[O]nce a criminal defendant requests a limiting instruction, the trial court has a duty to correctly instruct the jury, notwithstanding defense counsel's

- 15 -

failure to propose a correct instruction." State v. Gresham, 173 Wn.2d 405, 424, 269 P.3d 207 (2012).

> The court gave the following written limiting instruction to the jury:

> Certain evidence has been admitted in this case for only a limited purpose. Evidence of the defendant's alleged prior sexual misconduct may be considered by you only for the purpose of considering whether such evidence demonstrated 1) a common scheme or plan, or 2) absence of mistake or accident. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

Instruction 9.

As previously discussed, the ER 404(b) evidence was admissible to show a common scheme or plan but was not properly admissible to show absence of mistake or accident. Thus, the trial court erred by instructing the jury that the challenged evidence could be used for the latter purposes. The State concedes as much in its appellate briefing: "If this Court concludes that the trial court erred in admitting the prior misconduct for that purpose, then it was also error to instruct the jury on that purpose." Resp't's Amended Br. at 22.

Failure to give a proper ER 404(b) limiting instruction may be harmless. State v. Mason, 160 Wn.2d 910, 935, 162 P.3d 396 (2007). The error is harmless "'unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986) (quoting State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980)). Thus, the relevant question is whether a reasonable probability exists that, had a correct limiting instruction been given, the outcome of Garrison's trial would have been materially affected.

The jury was first given an oral limiting instruction after A.W. and A.F. had finished testifying. At that time, the trial court only mentioned the common scheme or plan purpose.

> Certain evidence has been admitted in this case for only a limited purpose. This evidence of the defendant's alleged prior sexual misconduct may be considered by you only for the purpose of considering whether such evidence demonstrated a common scheme or plan. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

Later, at the close of the evidence, when the trial judge instructed the jury, Instruction 9, quoted above, which mentioned both common scheme or plan and absence of mistake or accident, was given.

The only other mention of absence of mistake or accident during the trial was by defense counsel during his closing argument. It was brief and misleading—presumably to Garrison's benefit:

> [A.F.]'s evidence is about common scheme and plan. Common scheme and plan that goes over a period -- well, it was 2011, eleven years. It's about absence and mistake, because there can't be any mistake. It has to be true. There's not a real possibility that it couldn't be true, or that it might not be true. And that's what's so important.

It is inconceivable that a handful of words in the written limiting instruction—offered without any further guidance—changed the outcome of this trial. The testimony of A.W. and A.F. was powerful because it described a sexual predator who employed similar tactics to gain access to his victims and grow their trust in him, and then attacked them when they were most vulnerable, while they were sleeping and alone—not because the testimony tended to disprove

some hypothetical mistake or accident. In fact, as discussed above, there was absolutely no evidence that Garrison's alleged touching of A.W. or A.F. was by mistake or accident. The issue was whether the touching occurred at all. There is no reasonable probability that the jury's verdict would have been different had it been instructed only on the common scheme or plan purpose.

## V

Garrison's final contention is that he was improperly sentenced as a persistent offender pursuant to the Persistent Offender Accountability Act, RCW 9.94A.570. At sentencing, the State argued that Garrison's 1981 Texas felony voluntary manslaughter conviction constituted a strike offense because it was comparable to two Washington felony offenses, manslaughter in the first degree and assault in the second degree. The trial court ruled that it was comparable to manslaughter in the first degree and sentenced Garrison accordingly. Garrison contends that the trial court erred by so ruling. We agree.[2]

## A

A "persistent offender" is an offender who:

> (a)(i) Has been convicted in this state of any felony considered a most serious offense; and
> (ii) Has, before the commission of the offense under (a) of this subsection, been convicted as an offender on at least two separate occasions, whether in this state or elsewhere, of felonies that under the laws of this state would be considered most serious offenses and would be included in the offender score under RCW 9.94A.525.

RCW 9.94A.030(37).

---

[2] By separate order, we grant, in part, the State's motion for reconsideration of our initial resolution of this issue.

As our Supreme Court has noted, application of this provision can be broken down into four steps:

> After a defendant has been convicted in this state of a most serious offense, RCW 9.94A.030[(37)](a)(i), four more elements must be present for a defendant to be declared a persistent offender: (1) The defendant must have been previously convicted on at least two separate occasions, (2) in this state or elsewhere, (3) of felonies that, under the laws of this state, would be considered most serious offenses (defined in RCW 9.94A.030[(33)]), and (4) would be included in the offender score under RCW 9.94A.[525].[3]

State v. Morley, 134 Wn.2d 588, 603, 952 P.2d 167 (1998). The third and fourth steps are herein at issue.

To constitute a strike offense for persistent offender sentencing, a prior conviction must both be included in the defendant's offender score *and* be a "most serious offense." RCW 9.94A.525 governs the classification of out-of-state convictions for offender score purposes. It provides, in pertinent part: "Out-of-state convictions for offenses shall be classified according to the comparable offense definitions and sentences provided by Washington law." RCW 9.94A.525(3). In this context, the relevant comparison is to "Washington criminal statutes in effect when the foreign crime was committed." Morley, 134 Wn.2d at 606. "If the [out-of-state] conviction is comparable to a Washington crime, it counts toward the offender score as if it were the equivalent Washington offense." Morley, 134 Wn.2d at 606.

RCW 9.94A.030(33) defines "most serious offense." That definition includes, in pertinent part, "any . . . out-of-state conviction for an offense that

---

[3] The current provisions are bracketed. The current version is the same as was in effect at the time that Garrison committed the instant offense.

under the laws of this state would be a felony classified as a most serious offense under this subsection." RCW 9.94A.030(33)(u). In this context, the relevant comparison is to offenses that would have constituted "most serious offenses" at the time that the defendant committed the offense for which he is being sentenced. State v. Varga, 151 Wn.2d 179, 191, 86 P.3d 139 (2004) ("We have repeatedly held that sentencing courts must 'look to the statute in effect at the time [the defendant] committed the [current] crimes' when determining defendants' sentences." (alterations in original) (quoting State v. Delgado, 148 Wn.2d 723, 726, 63 P.3d 792 (2003))). If the elements of the out-of-state conviction are comparable to the elements of a most serious offense, the prior conviction is considered a most serious offense. State v. Webb, 183 Wn. App. 242, 247-48, 333 P.3d 470 (2014), review denied, 182 Wn.2d 1005 (2015).

Washington law employs the same two-part test to determine the comparability of a foreign offense for both the offender score and "most serious offense" analyses. Compare State v. Thiefault, 160 Wn.2d 409, 415, 158 P.3d 580 (2007) (offender score), with Webb, 183 Wn. App. at 247-48 ("most serious offense"). "A court must first query whether the foreign offense is legally comparable." Thiefault, 160 Wn.2d at 415. To do so, the court compares the elements of the out-of-state offense to the elements of the relevant Washington criminal statute. Morley, 134 Wn.2d at 606. If the elements of the foreign offense are broader than the Washington counterpart, they are not legally comparable.

"[T]he sentencing court must then determine whether the offense is factually comparable—that is, whether the conduct underlying the foreign offense would have violated the comparable Washington statute." Thiefault, 160 Wn.2d at 415. "[B]ecause the judicial determination of the facts related to a prior out-of-state conviction implicates the concerns underlying Apprendi[4] and Blakely,[5] judicial fact finding must be limited." State v. Thomas, 135 Wn. App. 474, 482, 144 P.3d 1178 (2006). Thus, in making its factual comparison, the sentencing court may rely only on facts in the foreign record "that are admitted, stipulated to, or proved beyond a reasonable doubt." Thiefault, 160 Wn.2d at 415.

"[T]he State . . . bears the burden of proving the convictions are comparable to Washington crimes." In re Pers. Restraint of Cadwallader, 155 Wn.2d 867, 876, 123 P.3d 456 (2005). Our review is de novo. State v. Beals, 100 Wn. App. 189, 196, 997 P.2d 941 (2000).

B

Garrison pleaded guilty to voluntary manslaughter in Texas in 1981. At that time, V.T.C.A. Penal Code, § 19.04(a) defined the offense of "voluntary manslaughter" as follows:

> A person commits an offense if he causes the death of an individual under circumstances that would constitute murder *under Section 19.02 of this code,* except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.[6]

---

4 Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).
5 Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).
6 "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." Former V.T.C.A. Penal Code,

(Emphasis added.)

In 1981, the murder statute referenced therein provided, in pertinent part: "(a) A person commits an offense if he: . . . (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." V.T.C.A. Penal Code, § 19.02.

Thus, to obtain a conviction under the theory alleged, the State of Texas had to prove that: "(1) [Garrison] committed an act with intent to cause serious bodily injury; (2) this act was 'objectively clearly dangerous to human life'; and (3) this act caused [the victim's] death." Nickerson v. State, 69 S.W.3d 661, 666 (Tex. Ct. App. 2002) (quoting Lugo-Lugo v. State, 650 S.W.2d 72, 81 (Tex. Crim. App. 1983)).

At the time of Garrison's crime, Texas defined "serious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." V.T.C.A. Penal Code, § 1.07(a)(34).

C

The State first contends that Garrison's Texas conviction constitutes a strike offense because it was for a Texas offense comparable to Washington's offense of manslaughter in the first degree.

---

§19.04(b) (1974). "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Former V.T.C.A. Penal Code, §19.04(c) (1974).

Washington defines manslaughter in the first degree as "recklessly caus[ing] the death of another person." RCW 9A.32.060(1)(a). This definition was in effect both at the time of Garrison's current offense and at the time of his 1981 Texas offense. Compare RCW 9A.32.060(1)(a) (current and applicable at the time of the current offense) with former RCW 9A.32.060(1)(a) (1975) (applicable at time of 1981 Texas offense). Thus, the same comparability analysis applies to both the offender score inquiry and the "most serious offense" inquiry.

The State concedes on appeal that the prong of Texas's voluntary manslaughter statute under which Garrison was convicted is not legally comparable to Washington's offense of manslaughter in the first degree.[7] However, the State contends that the two offenses are factually comparable. This is so, the State asserts, because Garrison admitted the allegation in the information that he "intentionally and knowingly commit[ted] an act clearly dangerous to human life," when he pleaded guilty. This is incorrect.

In its attempt to establish factual comparability, the State relies entirely on two documents related to the Texas conviction—the information and the judgment and sentence. In particular, it relies on the following allegation from the information: "GARRISON did then and there: . . . intentionally and knowingly

---

[7] We agree. Under the Texas statute, no culpable mental state attaches to the result. By contrast, the Washington statute does require a culpable mental state—recklessness—with respect to the result. A person could be convicted of Texas voluntary manslaughter without having any culpable mental state connected to the result of death, whereas the Washington offense of first degree manslaughter requires that a person recklessly cause a person's death. Thus, the Texas statute is broader than the Washington statute, and the offenses are not legally comparable.

commit an act clearly dangerous to human life, to-wit: striking the head and body of the said [T.M.C.]," and the following statement in the judgment and sentence:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that on this the 15th day of September, 1981, . . . GARRISON is guilty of the offense of voluntary manslaughter *as charged in the information* in this cause, and as confessed by him in his plea of guilty herein made.

(Emphasis added.) The State contends that, together, these statements mean that Garrison admitted to acting "intentionally and knowingly" when he committed the 1981 offense. This contention is foreclosed by our decision in State v. Thomas, 135 Wn. App. 474.

In Thomas, the State sought to establish that the defendant's California burglary convictions were comparable to Washington's burglary offense. The State conceded that the California crime of burglary was not legally comparable because the Washington crime required proof of *unlawful* entry. However, the State argued that the burglary convictions were factually comparable to Washington's burglary offense. To establish the comparability of one of the defendant's convictions, the State relied on an allegation in the charging instrument that the defendant "did willfully, *unlawfully,* and feloniously enter," and a statement in the judgment that the defendant "pled guilty . . . as alleged in the Complaint." Thomas, 135 Wn. App. at 479, 485.

Rejecting the State's contention, we explained that, when determining whether an out-of-state conviction is comparable to a Washington crime, a sentencing court may not assume that "facts alleged in the charging document

[that] are not directly related to the elements" of the charged offense have been proved or admitted. Thomas, 135 Wn. App. at 486.

Moreover, this case is unlike State v. Releford, 148 Wn. App. 478, 200 P.3d 729 (2009). In that case, we affirmed the trial court's conclusion that an Oklahoma burglary conviction was factually comparable to the Washington burglary offense based in part on factual allegations contained in the charging document. As we explained, our holding in that case was grounded in Oklahoma law.

> In Oklahoma, "[a] plea of guilty admits the facts pleaded in the Information." . . . There is no basis for us to conclude that, where a defendant enters a plea of guilty at a point in time and in a foreign jurisdiction where such a plea constitutes an admission of the facts alleged by the government in the charging document, such an admission cannot be later relied upon to prove factual comparability for purposes of a subsequent sentencing in Washington.

Releford, 148 Wn. App. at 488 (first alteration in original).

There is no equivalent rule in the law of Texas. In Texas, on a plea of guilty before a judge, "the defendant may consent to the proffer of evidence in testimonial or documentary form, or to an oral or written stipulation of what the evidence against him would be, without necessarily admitting to its veracity or accuracy." Menefee v. State, 287 S.W.3d 9, 13 (Tex. Crim. App. 2009). Alternatively, a defendant "may enter a sworn written statement, or may testify under oath in open court, specifically admitting his culpability or at least acknowledging generally that the allegations against him are in fact true and correct." Menefee, 287 S.W.3d at 13.

- 25 -

The State produced no evidence herein of an evidentiary stipulation or "judicial confession" in Garrison's Texas case. The Texas paperwork related to the manslaughter conviction sets forth no underlying facts of the crime that were admitted, stipulated to, or proven beyond a reasonable doubt. Thus, Thomas governs our inquiry, not Releford.

There is no way for us to determine, as a factual matter, whether Garrison recklessly caused the death in the Texas case. Therefore, the State has not met its burden of establishing that Garrison's Texas offense is factually comparable to Washington's offense of manslaughter in the first degree.

D

The State next contends that Garrison's Texas conviction constitutes a strike offense because it is comparable to Washington's offense of assault in the second degree.

i

We begin with the offender score inquiry. In 1981, Washington defined assault in the second degree, in pertinent part, as "knowingly inflict[ing] grievous bodily harm upon another with or without a weapon." Former RCW 9A.36.020(1)(b) (1979). Under the common law, "'grievous bodily harm' include[d] a hurt or injury calculated to interfere with the health or comfort of the person injured." State v. Salinas, 87 Wn.2d 112, 121, 549 P.2d 712 (1976) (quoting jury instructions with approval).

As set forth above, supra section V, subsection B, to be convicted of the Texas offense of which Garrison was convicted, a person must act with the

specific intent to cause serious bodily injury, while actually causing death. Thus, the three constituent parts of the Texas statute are: (1) culpability—intention, (2) type of harm, and (3) result—death. By contrast, the three constituent parts of the Washington comparator offense are: (1) culpability—knowledge, (2) type of harm (attached to the mental state)—grievous bodily harm, and (3) result— grievous bodily harm.

Comparing each part in turn, a person who acts intentionally satisfies a requirement that he act knowingly. RCW 9A.08.010(2). Thus, the Washington culpability requirement is broader than the parallel Texas requirement. Furthermore, because a "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ," V.T.C.A. Penal Code, § 1.07(a)(34), will always meet the standard of a hurt or injury that "interfere[s] with the health or comfort of the person injured," Salinas, 87 Wn.2d at 121, the type of harm attached to the mental state under the Washington statute is also broader than the parallel requirement under the Texas statute. Finally, the Washington requirement that grievous bodily harm result is less severe than the Texas requirement that the result be death. Thus, each element of the Texas offense is narrower than its Washington counterpart. Therefore, the two offenses are legally comparable for offender score purposes.

ii

Turning to the "most serious offense" inquiry, assault in the second degree is currently defined, in pertinent part, as "[i]ntentionally assault[ing][8] another and thereby recklessly inflict[ing] substantial bodily harm."[9] RCW 9A.36.021(1)(a). "'Substantial bodily harm' means bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b).

Because a person who killed another while intending to inflict serious bodily harm would have intentionally touched another in a "harmful or offensive" manner, a person convicted of voluntary manslaughter in Texas in 1981 necessarily engaged in conduct constituting an "intentional[ ] assault" under Washington's assault in the second degree statute. We focus, then, on the Washington statute's reckless infliction of substantial bodily harm requirement. To satisfy this portion of the Washington comparator offense, a person must cause substantial bodily harm while acting recklessly with regard to the risk that substantial bodily harm will result. There are three constituent parts: (1) culpability—recklessness, (2) type of harm—substantial bodily harm, and (3) result—substantial bodily harm.

---

[8] "'An assault is an intentional touching, striking, cutting, or shooting of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person.'" State v. Smith, 159 Wn.2d 778, 781-82, 154 P.3d 873 (2007) (quoting common law definition).

[9] The provisions cited mirror those in effect at the time that Garrison committed the underlying offense against A.W.

In attempting to prove comparability, the State's analytical problem is with the requirement regarding the type of harm.[10] In order for the relevant offenses to be legally comparable, the type of harm required under the Texas statute must be the same as or narrower than the type of harm required under the Washington statute. Stated differently, when conduct satisfies the type of harm requirement under the Texas statute, it must also satisfy the parallel Washington requirement. For this to be the case, the harm required under the Texas statute must be greater than or equal to the harm required under the Washington statute.

There are three ways to establish "serious bodily injury" under the Texas law at issue, including "protracted loss or impairment of the function of any bodily member or organ." V.T.C.A. Penal Code, § 1.07(a)(34). The parallel Washington provision requires "temporary but substantial loss or impairment of the function of any body part or organ, or which causes a fracture of any body part." RCW 9A.04.110(4)(b). Texas courts have adopted the "common meaning" of the word "protracted," which is synonymous with "continuing, dragged out, drawn out, elongated, extended, lengthened, lengthy, lingering, long, long-continued, long-drawn, never-ending, ongoing, prolix, prolonged, or unending." Moore v. State, 739 S.W.2d 347, 352 (Tex. Crim. App. 1987) (citing Burton, Legal Thesaurus 418 (1980 edition)). Thus, in terms of the temporal requirements present in the two comparator statutes, the Texas requirement of

---

[10] A person who acts intentionally satisfies a requirement that he act recklessly. RCW 9A.08.010(2). Furthermore, a required result of death is more severe than a required result of substantial bodily harm. Therefore, the Texas voluntary manslaughter statute is narrower than the Washington comparator in terms of both the culpability required and the result required.

"protracted" injury is narrower than the Washington requirement of a "temporary" injury.

However, in addition to the temporal requirement, the Washington statute also requires that the loss or impairment be "substantial." Because the Texas requirement that the injury be "protracted" is grounded firmly in the injury's duration, and not its severity, we cannot read a requirement that the injury be "substantial" into the Texas statute. Compare Williams v. State, 575 S.W.2d 30, 33 (Tex. Crim. App. 1979) (injury that caused victim to lose lifting power in his arm for three months constitutes a "protracted impairment") with Villarreal v. State, 716 S.W.2d 651, 652 (Tex. Ct. App. 1986) (evidence of victim's inability to raise arms for two weeks caused by pain of injury did not show "protracted loss or impairment"). See also Allen v. State, 736 S.W.2d 225, 226-27 (Tex. Ct. App. 1987) (injury which caused victim to have dysfunction in her injured finger constituted protracted impairment because it lasted for more than three months); Sanchez v. State, 543 S.W.2d 132, 134 (Tex. Crim. App. 1976) (loss of consciousness and temporary amnesia following alleged aggravated assault "insufficient to show any 'protracted loss or impairment'").

Conversely, the requirement that the injury be "substantial" cannot be read out of the Washington statute. To do so not only would ignore the plain language of the statute, but would also contradict our Supreme Court's interpretation of that statute, which emphasized the significance of the word "substantial." "[T]he term 'substantial,' as used in RCW 9A.36.021(1)(a), signifies a degree of harm that is considerable and necessarily requires a showing greater than an injury

- 30 -

merely having some existence." State v. McKague, 172 Wn.2d 802, 806, 262 P.3d 1225 (2011). Therefore, Garrison's Texas offense is not legally comparable to Washington's present offense of assault in the second degree.

Moreover, as explained above, because the State produced no evidence of facts of the Texas offense that were admitted, stipulated to, or proven beyond a reasonable doubt, the State cannot establish the factual comparability of the Texas and Washington convictions.

Accordingly, the State did not meet its burden of establishing that Garrison's Texas offense constituted a "most serious offense."

### E

The parties agree that Garrison's 1981 Texas voluntary manslaughter conviction is comparable to Washington's offense of manslaughter in the second degree.

"A person is guilty of manslaughter in the second degree when, with criminal negligence, he causes the death of another person." Former RCW 9A.32.070(1) (1975). In 1981, second degree manslaughter was a class C felony.[11] Former RCW 9A.32.070(2).

The offender score statute governs when class C felony convictions may be included in a defendant's offender score. The relevant subsection provides, in pertinent part:

---

[11] It is now a class B felony. This legislative reclassification has no effect on Garrison's prior conviction. See Rivard v. State, 168 Wn.2d 775, 781-82, 231 P.3d 186 (2010) ("[T]he subsequent reclassification of an offense from a class B to a class A felony has no effect on a prior conviction for that offense and does not retroactively convert the conviction to a class A felony.").

> [C]lass C prior felony convictions other than sex offenses shall not be included in the offender score if, since the last date of release from confinement (including full-time residential treatment) pursuant to a felony conviction, if any, or entry of judgment and sentence, the offender had spent five consecutive years in the community without committing any crime that subsequently results in a conviction.

RCW 9.94A.525(2)(c).

The statute contains a "trigger" clause, which identifies the beginning of the five-year period, and a "continuity/interruption" clause, which sets forth the substantive requirements a person must satisfy during the five-year period. State v. Ervin, 169 Wn.2d 815, 821, 239 P.3d 354 (2010). Any offense committed after the trigger date that results in a conviction resets the five-year clock. Ervin, 169 Wn.2d at 821. For instance, incarceration for a probation violation constitutes confinement pursuant to a felony conviction within the meaning of the statutory washout provision. State v. Mehrabian, 175 Wn. App. 678, 714, 308 P.3d 660, review denied, 178 Wn.2d 1022 (2013). However, once a conviction washes out, it cannot count as a "most serious offense" in the defendant's criminal history. State v. Failey, 165 Wn.2d 673, 678, 201 P.3d 328 (2009) (prior conviction that washes out is not counted as a strike offense).

Garrison's latest five-year clock began to run when he was released from confinement on the second degree assault conviction in May 2005. The offense for which he was convicted in the present case occurred in December 2011. Accordingly, Garrison spent five years in the community "since the last date of release from confinement" without committing any new crime that resulted in conviction. Taking manslaughter in the second degree as the proper Washington

comparator, Garrison's 1981 Texas conviction for voluntary manslaughter washed out and, thus, could not constitute a strike offense.

The trial court's conclusion that Garrison must be sentenced as a persistent offender because he was convicted on two prior occasions of strike offenses is, therefore, incorrect. His case must be remanded for resentencing.

Affirmed in part, reversed in part, and remanded for resentencing.

We concur: