

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-17-00221-CR

---

ASPEN WARREN                                                     APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1443873D

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Aspen Warren of murdering Brittany Daniel in a road-rage shooting, and the trial court sentenced him to fifty years' confinement. In three points, Appellant challenges the sufficiency of the evidence supporting his conviction and the admission of recordings of his interview with police and of his later telephone conversation with his mother from jail, both of which implicate

---

[1]See Tex. R. App. P. 47.4.

him as the shooter. We affirm.

## I. FACTUAL BACKGROUND

### A. Daniel and Appellant Were Both Driving East on I-30 When Appellant Shot Her.

On January 27, 2016, sometime after 6:00 p.m., Daniel, coworker Jasmine Thomas, and another coworker left work in Fort Worth; Daniel was giving her coworkers rides home in her Honda Accord. After dropping the other coworker off in Fort Worth, Daniel drove east on I-30, planning to take Thomas to her home in Arlington.

Meanwhile, Appellant was driving a red or burgundy Chevy Malibu owned by his girlfriend, Bri'Anna Walker. Walker and three other passengers—Trinton Kennedy, A'Lexus Donald, and Sha'Brandon Young—were in the Malibu with Appellant. Walker was in the front passenger seat, Kennedy sat behind her, Young sat behind Appellant, and Donald sat between Kennedy and Young. Kennedy had a light complexion; Appellant was dark. They were on their way from Fort Worth to Appellant's apartment near Six Flags in Arlington.

Walker worked in Fort Worth at the Walgreen's located at the intersection of Berry Street and McCart Avenue. Appellant's ex-girlfriend by the time of trial, Walker testified that she and Appellant had been arguing since he and his friends picked her up from work at around 6:30 p.m. that day. The argument began because she had noticed a chip in the tint on the Malibu's window. In his interview with Arlington police, Appellant stated that earlier on the same day as

2

the offense, Young shot one of the Malibu's passenger-side windows, damaging the tint.

When Appellant entered I-30, he pulled in front of Daniel's Accord. Daniel switched lanes, passed Appellant, and then pulled in front of him, causing him to brake hard. Appellant sped up, catching up with Daniel's Accord when they were nearly to Arlington. When Appellant pulled up to the left of Daniel's Accord, Kennedy rolled down his window. Kennedy and Daniel yelled at each other through their open windows, he called her names, and she flipped him off. Daniel rolled her window back up, and she and Thomas began chatting again. Appellant, however, slowed the Malibu down, rolled down its front passenger-side automatic window, fired two shots "literally two or three inches from [Walker's] face" and out the window toward Daniel, and sped off. Walker testified that Appellant fired the shots and that they were not fired from the backseat or from anyone in the backseat.

Meanwhile, after Thomas heard the shots, Daniel jumped and grabbed her left side, told Thomas that she had been hit and to call 911, and drove the Accord to the right shoulder of I-30 between the Cooper Street and Center Street exits just west of Six Flags. Daniel then became unresponsive.

## B.    Daniel Died from Her Gunshot Wound.

Thomas called 911 at 6:55 p.m. By the time Arlington police arrived, Daniel was slumped over the Accord's steering wheel, had no pulse, and was not breathing. The police and other emergency personnel saw no visible signs of

3

blood or injury until they moved her. Then they could see blood on the left side of her torso under her arm. Daniel was transported to Arlington Memorial Hospital, where attempts at resuscitation failed. Dr. Nizam Peerwani, the Chief Medical Examiner of Tarrant, Denton, Parker, and Johnson Counties, later autopsied her body and determined that she died of internal bleeding and that her cause of death was a gunshot wound.

## C. The Police Initially Had Very Little Information from Which to Determine the Killer's Identity.

Although Thomas told police at the scene that she heard two shots, she testified that she heard what sounded like "[m]aybe three" pellet- or BB-gun shots about "half a minute" after Daniel "shot the finger" at the back-seat passenger (identified at trial as Kennedy) in the car that had been traveling beside Daniel's Accord for two to four minutes. Thomas knew the shots came from that car but did not see a flash or the gun, could not identify that car or the shooter, and knew only that the passenger Daniel exchanged words with was a black man with a light complexion. The police sought more information through the media.

## D. An Anonymous Tip Eventually Led the Police to Appellant, Who Confessed.

Two days after the murder, an anonymous caller told Arlington Homicide Detective Steven Griesbach that A'Lexus Donald was in the car. That tip led to successive interviews with the Malibu's four passengers—Donald, Young, Kennedy, and Walker—and ultimately to Appellant's arrest. All four passengers told Arlington police that Appellant was the shooter, although Walker initially

4

claimed that Kennedy fired the shots.

In his post-arrest interview with Arlington police, Appellant eventually admitted that he fired at Daniel to scare her. He repeated in his telephone call to his sister from jail that he had shot "just to scare" Daniel and that killing her was "not intentional." He was resolved to accept full responsibility. However, he also stated to the police, "You can't road-rage somebody and expect somebody not to road-rage you back."

**E. The Bullet Recovered from Daniel's Body Passed Through the Accord's Driver's Door First.**

Dr. Peerwani testified that the bullet that killed Daniel had traveled from her left flank about 42.5 inches above her left heel and was recovered just under her skin on her right side, about 44 inches above her right heel. The bullet pierced her diaphragm on both sides, perforated her stomach, and went through her pancreas and liver.

When Dr. Peerwani found the bullet in Daniel's body, it was intact except that it was "slightly altered or damaged in the tip area." Jamie Becker, a firearm and tool mark examiner for the Tarrant County Medical Examiner's Office, examined the bullet and testified that the bullet was a hollow-point; she agreed with Dr. Peerwani that its nose was damaged.

Dr. Peerwani opined that the bullet had passed through an object before entering Daniel, based on the irregular abrasion of the entry wound indicating that the bullet was "yawing or tumbling" rather than "spinning in a straightforward

5

axis" as it hit the surface of Daniel's body.

Arlington police found two bullets' entry holes, one in each of the Accord's driver's side doors just below the door handles, and one exit hole, a little lower than the entry holes, on the right rear door. Dr. Peerwani testified that passing through the Accord's driver's door probably caused the recovered bullet's defect at its tip.

**F.  While the Murder Weapon and Casings Were Not Recovered, Walker's Stepfather Was Missing a Gun from Which the Bullet Could Have Been Fired.**

Appellant told the police in his interview that the gun he shot at Daniel was a .40-caliber Smith & Wesson semiautomatic handgun that was chrome and black. Detective Griesbach testified that Appellant told the police the same. Appellant also told the police—and later told his mother in a telephone call from jail that he had done so—that he sold the gun and got rid of the casings.

Walker's stepfather, Keith Moore, testified that:

- Appellant and Walker were dating in January and February 2016;

- Moore owned a registered silver and black .40 caliber Smith & Wesson handgun;

- Moore kept his handgun in its original box by his bedside in a clear multidrawer container;

- Moore's handgun could be seen from the hallway near his and Walker's bedrooms;

- Moore last saw it around Christmas 2015;

- Appellant was at Moore's home more than nine times and was there even when Moore and his wife were absent;

6

- Moore noticed his handgun missing around February 12, 2016;

- Moore saw no signs of forced entry in his home; the family had a German Shepherd in the back yard and burglar bars; and

- Moore confronted Walker about his missing handgun, filed a police report, and told the police his concerns about his handgun being involved in Daniel's murder.

Firearm and Toolmark Examiner Becker testified about guns compatible with the recovered bullet:

- "Winchester loads that bullet design in .40 S&W caliber cartridges";

- One compatible gun on her noncomprehensive list was "an SW40 EV";

- The gun pictured in State's Exhibit 9—Moore's handgun—was not on her list but was "very close in model design" to the guns on her list;

- She "would expect for Smith & Wesson to probably have that same type of characteristics for their marks"; and

- The gun used to kill Daniel was "most likely" a .40 Smith & Wesson caliber semi-automatic.

## II.    RELEVANT PROCEDURAL HISTORY

Appellant objected unsuccessfully to the admission of his recorded interview with Arlington detectives and his recorded telephone calls with his mother and sister but did not object to testimony about the content of the telephone conversations.

## III.    SUFFICIENCY OF THE EVIDENCE

In his first point, Appellant contends that the evidence is insufficient to support his conviction.

**A.     We Review the Evidence in the Light Most Favorable to the Verdict.**

In our due-process review of the sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

**B.    Appellant Was Indicted and Tried, and the Jury Was Charged, on All Three Manners and Means of Murder.**

Section 19.02(b) of the Texas Penal Code provides that a person commits murder if he:

    (1)    intentionally or knowingly causes the death of an individual;

    (2)    intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

    (3)    commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

Tex. Penal Code Ann. § 19.02(b) (West 2011). In Texas, "[a] person acts intentionally, or with intent, [concerning] the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). Moreover, "[a] person acts knowingly, or with knowledge, [concerning] a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). The phrase "clearly dangerous to human life" is not defined by the penal code, but the test is whether the act objectively created a substantial risk of death. *Lugo–Lugo v. State*, 650 S.W.2d 72, 81–82 (Tex. Crim. App. 1983); *Compton v. State*, No. 2-06-281-CR, 2007 WL 4462575, at *6 (Tex. App.—Fort Worth Dec. 20, 2007, no pet.) (mem. op., not designated for publication); *see also Depauw v. State,* 658 S.W.2d 628, 634 (Tex. App.—Amarillo 1983, pet. ref'd). The Texas Court of

9

Criminal Appeals has stated that "firing a gun in the direction of an individual is an act clearly dangerous to human life." *Forest v. State*, 989 S.W.2d 365, 368 (Tex. Crim. App. 1999).

In three paragraphs, the grand jury indicted Appellant with murder under all three statutory alternative manners and means, and the jury was charged on all three alternatives as well. *See* Tex. Penal Code Ann. § 19.02(b).

## C.    Sufficient Evidence Supports the Jury's Guilty Verdict.

Appellant's argument supporting his sufficiency challenge is that

> [t]he evidence is inconsistent with [him] being the shooter.  The shooter is Trinton Kennedy, who was in [the] right rear back seat of the Chevrolet Malibu.  The testimony of the bullet path, which was at a downward angle, makes Trinton Kennedy the shooter.  If Appellant . . . was the shooter, he would have shot his girlfriend, not the driver of the Honda.

Deferring to the jury's resolution of any conflicts in the evidence in favor of its verdict, we hold that the evidence sufficiently supports Appellant's conviction beyond a reasonable doubt. *See Blea*, 483 S.W.3d at 33; *Murray*, 457 S.W.3d at 448–49.

*First,* Appellant admitted to the police and his family members that he shot Daniel and got rid of the gun and spent casings. *Second*, Walker testified that Appellant let down her automatic passenger-side window and fired two shots across her into Daniel's car, and the remaining passengers in the Malibu also told the police that Appellant was the shooter. *Third*, while Appellant indicated that he did not intend to kill Daniel, he admitted that he did intend to scare her and to "road-rage her back," and the evidence shows that he intentionally fired

10

the gun in the direction of her vehicle at least twice. *Fourth*, Appellant told the police that he used a Smith & Wesson .40 caliber semiautomatic, the bullet recovered from Daniel's body was compatible with that weapon, and Walker's stepfather was missing such a weapon. *Fifth*, Appellant pursued at trial his theory that Kennedy had to be the shooter because (1) the exit point of the bullet that did *not* hit Daniel—that bullet entered Daniel's Accord just under the left passenger-door handle and exited through the right rear passenger door—was a little bit lower than its entry point and (2) Walker suffered no powder burns, and no obvious gunshot residue landed on her. The jury rejected that theory, and it is not within this Court's province to challenge that determination. *See Montgomery*, 369 S.W.3d at 192. The evidence places the gun in Appellant's hands and sufficiently supports the elements of murder beyond a reasonable doubt. *See* Tex. Penal Code Ann. § 19.02(b); *Murray*, 457 S.W.3d at 448–49. We therefore overrule his first point.

## IV. EVIDENTIARY RULINGS

When the State moved to admit State's Exhibit 51,[2] an audiotape of telephone calls Appellant made from jail to his sister and mother, he objected on hearsay and rule 403 grounds without further specificity. The trial court overruled

---

[2]Appellant refers to State's Exhibit 57, an exhibit that does not appear to exist, but he describes it as "the audio tape of the phone calls from the jail between Appellant, Warren, and his mother," which is State's Exhibit 51. We therefore conclude that "57" is a typographical error.

11

the objections. Appellant renewed his general objections before the tape was played. Appellant did not obtain a running objection or separately object to Detective Griesbach's testimony about the import of the tape after the jury listened to it.

When the State moved to admit State's Exhibit 53, the recording of Appellant's police interview, Appellant objected under rule 403 without further specificity. The trial court overruled the objection. Before the interview was published to the jury, Appellant stated: "I'm going to renew my objection to 53, Judge. There is clearly hearsay on 53, and I would suggest to the Court that the probative value is outweighed by the prejudicial effect. And I'm going to renew my objection." The trial court again overruled Appellant's objection and the interview was played for the jury.

In Appellant's remaining two points, he challenges the admission of that portion of State's Exhibit 51 containing the recorded telephone call between his mother and him (second point) and the admission of State's Exhibit 53, his recorded interview with Arlington police (third point) over his rule 403 objections.

## A.    Appellant's Predicate and Balancing-Test Complaints Are Forfeited.

In both his second and third points, Appellant complains that the proper predicate was not laid for the admission of each challenged exhibit. However, at trial he did not object on that ground to the admission of either challenged exhibit. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for

12

the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1461 (2016). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

Additionally, the complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."); *Pena*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial."). To determine whether the complaint on appeal comports with that made at trial, we consider the context in which the complaint was made and the parties' shared understanding at that time. *Clark*, 365 S.W.3d at 339; *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009); *Pena*, 285 S.W.3d at 464. Because Appellant did not raise a predicate objection at trial, he has forfeited his predicate complaints.

Similarly, Appellant contends in both remaining points that the trial court did not conduct a balancing test as required by rule 403, but he did not raise this specific complaint in the trial court. We therefore hold that Appellant's "balancing test" complaints are also forfeited. *See Clark*, 365 S.W.3d at 339; *Lovill*, 319 S.W.3d at 691–92; *Pena*, 285 S.W.3d at 464; *see also Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997) ("[A] judge is presumed to engage in the required balancing test once Rule 403 is invoked and we refuse to hold that the silence of the record implies otherwise.") (citation omitted).

We overrule these portions of Appellant's second and third points.

**B.** **Appellant's Complaints About the Admission of the Tape of the Telephone Call with His Mother Are Forfeited.**

On the challenged tape, Appellant told his sister that he was going to take full responsibility for his actions and that his act was not intentional; he just wanted to scare Daniel. He does not challenge the admission of that portion of the tape on appeal. Elsewhere on the tape, Appellant told his mother that he had told the police that (1) he did not know what he had done with the gun; (2) he had sold it; (3) he did not know what he had done with the casings and (4) he had thrown them out.

Appellant did not make a running objection. Further, Detective Griesbach testified without objection after the tape's admission:

> Well, he's finally being honest and telling the truth about what happened. He's telling his sister that he's taking responsibility for what he did. *And then with his mom he's telling them also that he talked to the detectives and that he's taking responsibility.*

14

And he even went into detail about as far as what he said in the interview to us. *We asked him what happened to the handgun and shell casing, he's telling his mom that he told that—to us—told his mom that he told us that he sold the gun and he got rid of the shell casings, which further corroborates everything that we found out in this investigation.* [Emphasis added.]

The preservation rule requires a party to object each time objectionable evidence is offered unless the party has obtained a running objection or has requested a hearing outside the presence of the jury. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *see also Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (explaining that Texas applies the "futility rule," meaning that even after a trial court overrules an objection to evidence, a party must keep making "futile" objections on pain of waiver). Unobjected-to testimony about objected-to evidence results in forfeiture of the objection. *See Clay v. State*, 361 S.W.3d 762, 767 (Tex. App.—Fort Worth 2012, no pet.) ("[B]ecause Wallace provided testimony about the Louisiana records without objection before and after appellant's objection to the admission of the records and because appellant failed to obtain a running objection, we conclude that he forfeited his objection to the records' admission." (footnote omitted)); *see also Walker v. State*, No. 02-16-00418-CR, 2018 WL 1096060, at *4 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op., not designated for publication).

Appellant did not make a running objection to the tape and did not object when Detective Griesbach testified about the tape's importance. We therefore hold any error in the tape's admission forfeited, and we overrule the remainder of

Appellant's second point.

### C. We Review Appellant's Unfair-Prejudice Complaints Regarding the Admission of the Recording of His Police Interview for an Abuse of Discretion.

Rule 403 provides that "[t]he [trial] court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Appellant's original objection to the admission of State's Exhibit 53, the recording of his police interview, did not specify a rule 403 ground, but his renewed objection to State's Exhibit 53 clarified that his objection was based on unfair prejudice. Rather than holding that his complaint is forfeited for lack of specificity, *see Checo v. State*, 402 S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd), we conclude that the trial prosecutor and trial judge understood from the context that Appellant's rule 403 ground for his original objection to the admission of State's Exhibit 53 was also unfair prejudice.[3] *See State v. Rosseau*, 396 S.W.3d 550, 555 (Tex. Crim. App. 2013).

We review the trial court's admission of the challenged evidence for an abuse of discretion. *See Pawlak v. State*, 420 S.W.3d 807, 810 (Tex. Crim. App. 2013).

---

[3]To the extent that Appellant intended to complain on appeal of any other portion of rule 403, we hold that he has forfeited such complaint. *See Checo*, 402 S.W.3d at 451.

**D. Appellant's Recorded Interview with Arlington Police Is Not Unfairly Prejudicial.**

Rule 403 does not focus on all prejudice; it focuses only on prejudice that is unfair. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Manning v. State*, 114 S.W.3d 922, 927 (Tex. Crim. App. 2003). "Evidence is unfairly prejudicial if it has the capacity to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged." *Gonzalez*, 544 S.W.3d at 373; *see also Manning*, 114 S.W.3d at 928. The probative statements in Appellant's interview with police are his admissions that he was the shooter, that he sold the gun, that he disposed of the evidence, and that he was trying to scare Daniel because she was exhibiting road rage. While these statements are prejudicial—they damage Appellant's theory that Kennedy was the shooter and Appellant only the helpless driver who sped away after hearing the shots—they are not unfairly so. Appellant's statements from his police interview are crucial in establishing his mental state when he shot Daniel and his identity as the shooter, especially given his theory and Walker's early statements to Arlington police that Kennedy was the shooter. Because the challenged exhibit was not unfairly prejudicial to Appellant, we overrule the remainder of his third point.

## V. CONCLUSION

Having overruled Appellant's three points, we affirm the trial court's judgment.

17

/s/ Mark T. Pittman
MARK T. PITTMAN
JUSTICE

PANEL:  GABRIEL, PITTMAN, and BIRDWELL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 9, 2018